**AGREEMENT AND PLAN OF MERGER**

**BY AND AMONG**

**AUTONOMY CORPORATION PLC,**

**ANTELOPE ACQUISITION CORP.,**

**ZANTAZ, INC.**

**AND**

**GA ESCROW, LLC,**
**AS ESCROW PARTICIPANTS' REPRESENTATIVE**

**July 3, 2007**

1-SF/7551827.11

# TABLE OF CONTENTS

**Page**

ARTICLE I      THE MERGER ................................................................................... 2

    1.1    The Merger ............................................................................................ 2
    1.2    Closing ................................................................................................. 2
    1.3    Effects of the Merger ............................................................................. 2
    1.4    Further Assurances ................................................................................ 3

ARTICLE II    EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE
                  COMPANY AND MERGER SUB; EXCHANGE OF
                  CERTIFICATES ................................................................................... 3

    2.1    Merger Consideration ............................................................................ 3
    2.2    Determination of Closing Working Capital .............................................. 4
    2.3    Adjustment of Merger Consideration ...................................................... 5
    2.4    Effect on Company Capital Stock, Company Stock Options and Warrants .......... 6
    2.5    Dissenting Shares .................................................................................. 8
    2.6    Deposit of Funds by Parent; Exchange of Certificates ............................. 9
    2.7    No Further Ownership Rights ................................................................ 10
    2.8    No Liability ........................................................................................ 11
    2.9    Lost, Stolen or Destroyed Certificates .................................................. 11
    2.10   Withholding Rights .............................................................................. 11

ARTICLE III   REPRESENTATIONS AND WARRANTIES ............................................ 11

    3.1    Representations and Warranties of the Company .................................... 11
    3.2    Representations and Warranties of Parent and Merger Sub ...................... 39

ARTICLE IV   COVENANTS RELATING TO CONDUCT OF BUSINESS ...................... 41

    4.1    Conduct of Business ............................................................................ 41
    4.2    No Solicitation by the Company ............................................................ 45
    4.3    Employee Benefit Matters .................................................................... 47
    4.4    Resignations ....................................................................................... 48
    4.5    Consents ............................................................................................ 48
    4.6    Representative Agreement .................................................................... 48
    4.7    FIRPTA Certificate ............................................................................. 49
    4.8    Excise Tax .......................................................................................... 49
    4.9    Warrant Cancellation Agreements; Exchangeable Share Conversion .......... 49
    4.10   Payment of Indebtedness ..................................................................... 49

ARTICLE V    ADDITIONAL AGREEMENTS ............................................................. 49

    5.1    Company Shareholder Approval ............................................................ 49
    5.2    Access to Information; Confidentiality; Cooperation with Financing .......... 50
    5.3    Regulatory Approvals; Further Actions .................................................. 50
    5.4    Public Announcements ......................................................................... 52
    5.5    Directors' and Officers' Insurance and Indemnification .......................... 52

**TABLE OF CONTENTS**
(continued)

<strong>Page</strong>

| | | |
|---|---|---|
| 5.6 | Notification of Certain Matters | 53 |
| 5.7 | Operations of Merger Sub | 54 |
| 5.8 | Underwriting Agreement | 54 |
| 5.9 | Listing | 54 |

ARTICLE VI    CONDITIONS PRECEDENT .................................................. 55

| | | |
|---|---|---|
| 6.1 | Conditions to Each Party's Obligation to Effect the Merger | 55 |
| 6.2 | Conditions to Obligation of Parent and Merger Sub | 55 |
| 6.3 | Conditions to Obligation of the Company | 57 |

ARTICLE VII    TERMINATION, AMENDMENT AND WAIVER .................. 58

| | | |
|---|---|---|
| 7.1 | Termination | 58 |
| 7.2 | Effect of Termination | 60 |
| 7.3 | Fees and Expenses | 60 |
| 7.4 | Amendment | 61 |
| 7.5 | Extension; Waiver | 61 |

ARTICLE VIII    INDEMNIFICATION ........................................................ 61

| | | |
|---|---|---|
| 8.1 | Survival | 61 |
| 8.2 | Indemnification by Escrow Participants | 62 |
| 8.3 | Indemnity Escrow Fund | 63 |
| 8.4 | Third Party Claims | 64 |
| 8.5 | Non-Third Party Claims | 67 |
| 8.6 | Claims Upon Indemnity Escrow Fund | 67 |
| 8.7 | Representative Reserve Amount; Indemnification of the Escrow Participants' Representative | 67 |
| 8.8 | Effect of Investigation; Waiver | 68 |

ARTICLE IX    GENERAL PROVISIONS ..................................................... 68

| | | |
|---|---|---|
| 9.1 | Notices | 68 |
| 9.2 | Certain Definitions | 70 |
| 9.3 | Interpretation | 74 |
| 9.4 | Counterparts | 74 |
| 9.5 | Entire Agreement; No Third-Party Beneficiaries | 74 |
| 9.6 | Governing Law | 75 |
| 9.7 | Assignment | 75 |
| 9.8 | Consent to Jurisdiction | 75 |
| 9.9 | Enforcement | 75 |
| 9.10 | Severability | 75 |
| 9.11 | Obligations of Parent | 75 |

EXHIBITS:

| | |
|---|---|
| Exhibit A | Form of Representative Agreement |
| Exhibit B | Form of Employment Addendum |
| Exhibit C | Amended King Retention Agreement |
| Exhibit D | Form of Agreement of Merger |
| Exhibit E | Surviving Company Articles of Incorporation |
| Exhibit F | Form of Escrow Agreement |
| Exhibit G | Form of FIRPTA Certificate |
| Exhibit H | Form of Legal Opinion |
| Exhibit I | CFO Certificate |
| Exhibit J | Working Capital |

SCHEDULES:

| | |
|---|---|
| Schedule 2.1 | Allocation of Merger Consideration |
| Schedule 5.5(b) | D&O Insurance Premiums |
| Schedule 9.2(a)(xv) | Key Employees |

1-SF/7551827.11

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of July 3, 2007, by and among Autonomy Corporation plc, a corporation formed under the laws of England and Wales ("Parent"), Antelope Acquisition Corp., a California corporation ("Merger Sub"), and Zantaz, Inc., a California corporation (the "Company"), and GA Escrow, LLC, in its capacity as representative of the Escrow Participants pursuant to the Representative Agreement (the "Escrow Participants' Representative").

### W I T N E S S E T H:

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the California General Corporation Law ("CGCL"), Parent, Merger Sub and the Company intend to enter into a business combination transaction pursuant to which Merger Sub will merge with and into the Company (the "Merger"); and

WHEREAS, the Board of Directors of Parent (i) has determined that the Merger is fair to, and in the best interests of, Parent and its stockholders and (ii) has approved this Agreement, the Merger and the other transactions contemplated by this Agreement; and

WHEREAS, the Board of Directors of Merger Sub (i) has determined that the Merger is fair to, and in the best interests of, Merger Sub and its stockholders and (ii) has approved this Agreement, the Merger and the other transactions contemplated by this Agreement; and

WHEREAS, the Board of Directors of the Company (i) has determined that the Merger is fair to, and in the best interests of, the Company and its shareholders and (ii) has approved this Agreement, the Merger and the other transactions contemplated by this Agreement; and

WHEREAS, Parent, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger; and

WHEREAS, on or prior to the date of this Agreement, Parent has entered into a Placing Agreement with UBS Limited and Citigroup Global Markets U.K. Equity Limited (the "Underwriting Agreement"), a copy of which has been provided to the Company; and

WHEREAS, immediately following the execution and delivery of this Agreement, and as a condition and inducement to Parent and Merger Sub to enter into this Agreement, certain shareholders of the Company are executing and delivering to Parent (a) an action by written consent of the Company Shareholders voting in favor of the adoption of this Agreement and the transactions contemplated hereby sufficient to constitute the Company Shareholder Approval (together with an irrevocable voting proxy in favor of Parent), certified by the Secretary of the Company as having been filed with the Company, and (b) an executed Representative Agreement in the form attached as Exhibit A hereto (the "Representative Agreement"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition and inducement to Parent and Merger Sub to enter into this Agreement, each of the

Key Employees shall have entered into an addendum to terms of employment in the form attached as Exhibit B hereto ("Employment Addendum"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition and inducement to Parent and Merger Sub to enter into this Agreement, Steven R. King shall have entered into an amendment to that certain retention agreement dated as of April 5, 2007 between the Company and Steven R. King, in the form attached as Exhibit C hereto (the "Amended King Retention Agreement"),

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, Parent, Merger Sub and the Company hereby agree as follows:

## ARTICLE I

## THE MERGER

1.1    The Merger. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the CGCL, at the Effective Time, Merger Sub shall be merged with and into the Company, the separate corporate existence of Merger Sub shall cease and the Company, as the surviving corporation of the Merger (sometimes referred to herein as the "Surviving Corporation"), shall succeed to and assume all the rights and obligations of Merger Sub in accordance with the CGCL.

1.2    Closing. The closing of the Merger (the "Closing") shall take place at the offices of Morgan, Lewis & Bockius LLP, One Market Street, San Francisco, California, at 10:00 a.m., Pacific Time, on a date to be specified by the Parties which shall be no later than two Business Days after satisfaction (or written waiver as provided herein) of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or written waiver of such conditions), unless another time, date or place is agreed to in writing by the Parties. The date upon which the Closing occurs is herein referred to as the "Closing Date." Simultaneously with, or as soon as reasonably practicable following, the Closing (but in any case on the Closing Date), the Company as the surviving corporation shall file the agreement of merger in the form attached as Exhibit D hereto, together with any changes required by the Secretary of State of the State of California (the "Agreement of Merger") with the Secretary of State of the State of California as provided in the CGCL. The Merger shall become effective at such time as the Agreement of Merger is so filed or at such later time as is agreed to by the Parties and set forth in the Agreement of Merger, if different, which time is hereinafter referred to as the "Effective Time."

1.3    Effects of the Merger.

(a)    At and after the Effective Time, the Merger shall have the effects specified in the CGCL.

(b)    At the Effective Time, subject to Section 5.5(b), the Articles of Incorporation of the Company as the Surviving Corporation shall be amended and restated to read as set forth in the form attached hereto as Exhibit E, which shall be the same as the Articles

of Incorporation of Merger Sub as in effect immediately prior to the Effective Time, except that Article I of the Articles of Incorporation of the Surviving Corporation shall read as follows: "The name of this corporation is Zantaz, Inc." As so amended and restated, the Articles of Incorporation of the Company shall be the Articles of Incorporation of the Surviving Corporation until amended thereafter in accordance with applicable Law.

(c)     At the Effective Time, subject to Section 5.5(b), the Bylaws of the Company as the Surviving Corporation shall be amended and restated to read the same as the Bylaws of Merger Sub as in effect immediately prior to the Effective Time (except that all references to Merger Sub in the Bylaws of the Surviving Corporation shall be changed to refer to Zantaz, Inc.), until amended thereafter in accordance with applicable Law.

(d)     At the Effective Time, the directors and officers of Merger Sub immediately prior to the Effective Time shall be the directors and officers of the Surviving Corporation, each to hold office until their respective death, permanent disability, resignation or removal or until their respective successors are duly elected and qualified, all in accordance with the Articles of Incorporation and Bylaws of the Surviving Corporation and applicable Law.

1.4     Further Assurances. If, at any time after the Effective Time, the Surviving Corporation shall consider or be advised that any deeds, bills of sale, assignments or assurances or any other acts or things are necessary, desirable or proper (a) to vest, perfect or confirm, of record or otherwise, in the Surviving Corporation its right, title and interest in, to or under any of the rights, privileges, powers, franchises, properties or assets of either of Merger Sub or the Company, or (b) otherwise to carry out the purposes of this Agreement, the Surviving Corporation and its proper officers and directors or their designees shall be authorized to execute and deliver, in the name and on behalf of either of Merger Sub or the Company, all such deeds, bills of sale, assignments and assurances and to do, in the name and on behalf of either of Merger Sub or the Company, all such other acts and things as may be necessary, desirable or proper to vest, perfect or confirm the Surviving Corporation's right, title and interest in, to and under any of the rights, privileges, powers, franchises, properties or assets of either of Merger Sub or the Company and otherwise to carry out the purposes of this Agreement.

ARTICLE II

EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE COMPANY AND MERGER SUB; EXCHANGE OF CERTIFICATES

2.1     Merger Consideration.

(a)     The aggregate amount to be paid by Parent with respect to all of the outstanding shares of capital stock of the Company and any options or other rights to acquire any securities of the Company (including all (i) Company Common Stock and Company Preferred Stock; (ii) options to purchase shares of Company Common Stock (the "Company Options") under the Company Stock Option Plan, and (iii) Warrants) shall be equal to $400,000,000 in cash, less (x) Net Debt set forth in the CFO Certificate, and less (y) Company Transaction Expenses set forth in the CFO Certificate (the items referenced in (x) and (y), the "Closing Deductions"), and such amount shall be referred to as the "Merger Consideration." The amount

of Merger Consideration payable at Closing (the "Closing Consideration") shall be equal to the Merger Consideration, less (i) the Indemnity Escrow Amount and less (ii) the Working Capital Escrow Amount. The Closing Consideration shall be paid to each record holder of outstanding Company Capital Stock, Vested Company Options and Warrants (each a "Company Securityholder" and collectively the "Company Securityholders") pursuant to this Article II in the amounts set on Schedule 2.1 hereto, as updated as provided in the following paragraph. The amount of Merger Consideration is subject to adjustment as provided in Section 2.3.

(b)    Not more than five Business Days nor less than one Business Day prior to Closing, the Company shall prepare and deliver to Parent at the Closing an update to Schedule 2.1 hereto, which update shall be certified as true and correct in all respects by the Chief Financial Officer and Secretary of the Company and shall be in a form reasonably acceptable to Parent. Such update shall reflect any changes to Schedule 2.1 necessary to reflect any of the following: (i) transfers of ownership of Company Shares or Warrants occurring after the date hereof; (ii) exercises of Options and Warrants by the holders thereof occurring after the date hereof; and (iii) the required allocation of the Merger Consideration among the Company Securityholders, which, with respect to the Company Shareholders, is consistent with the terms of the Company's Articles of Incorporation in effect on the date hereof; provided, however, in no event shall such changes increase the Closing Consideration payable at Closing. References in the remainder of this Agreement to Schedule 2.1 shall be deemed to refer to Schedule 2.1 as so updated, and shall provide an update with respect to the Company Transaction Expenses as of the date thereof.

(c)    On the Closing Date, the Company shall pay to Steven R. King the King Bonus, which shall be deemed to have occurred immediately prior to the Closing.

2.2    Determination of Closing Working Capital.

(a)    Within 30 days after the Closing Date, Parent will prepare, or cause to be prepared, and deliver to the Escrow Participants' Representative an unaudited statement (the "Closing Working Capital Statement"), which shall set forth Parent's calculation of Working Capital as of the Closing Date ("Closing Working Capital"). Other than as set forth on Exhibit J attached hereto, the Closing Working Capital Statement shall be prepared in accordance with GAAP applied on a basis consistent with the Company's application of GAAP in its preparation of the Balance Sheet.

(b)    Upon receipt from Parent, the Escrow Participants' Representative shall have 45 days to review the Closing Working Capital Statement (the "Review Period"). If the Escrow Participants' Representative disagrees with Parent's computation of Closing Working Capital, the Escrow Participants' Representative may, on or prior to the last day of the Review Period, deliver a notice to Parent (the "Notice of Objection"), which sets forth the Escrow Participants' Representative's objections to Parent's calculation of Closing Working Capital. Any Notice of Objection shall specify those items or amounts with which the Escrow Participants' Representative disagrees, together with a detailed written explanation of the reasons for disagreement with each such item or amount, and shall set forth the Escrow Participants' Representative's calculation of Closing Working Capital based on such objections. To the extent not set forth in the Notice of Objection, the Escrow Participants' Representative shall be deemed,

on behalf of all Company Securityholders, to have agreed with Parent's calculation of all other items and amounts contained in the Closing Working Capital Statement. Parent and the Escrow Participants' Representative shall make available to the Independent Expert all relevant books and records, auditors' work papers and other items reasonably requested by the Escrow Participants' Representative.

(c)     Unless the Escrow Participants' Representative delivers the Notice of Objection to Parent within the Review Period, the Escrow Participants' Representative shall be deemed, on behalf of all Company Securityholders, to have accepted Parent's calculation of Closing Working Capital and the Closing Working Capital Statement shall be final, conclusive and binding. If the Escrow Participants' Representative delivers the Notice of Objection to Parent within the Review Period, Parent and the Escrow Participants' Representative shall, during the 30 days following such delivery or any mutually agreed extension thereof, use their commercially reasonable efforts to reach agreement on the disputed items and amounts in order to determine the amount of Closing Working Capital. If, at the end of such period or any mutually agreed extension thereof, Parent and the Escrow Participants' Representative are unable to resolve their disagreements, they shall jointly retain and refer their disagreements to the San Francisco metropolitan area office of a nationally recognized independent accounting firm that has not received fees in excess of $10,000 during the preceding twelve (12) months from either Parent or the Company and that is mutually acceptable to Parent and the Escrow Participants' Representative (neither of which will unreasonably withhold consent thereto) (the "Independent Expert"). Parent and the Escrow Participants' Representative shall instruct the Independent Expert promptly to review this Section 2.2 and to determine solely with respect to the disputed items and amounts so submitted whether and to what extent, if any, the Closing Working Capital set forth in the Closing Working Capital Statement requires adjustment. Parent and the Escrow Participants' Representative shall make available to the Independent Expert all relevant books and records, auditors' work papers and other items reasonably requested by the Independent Expert. Parent and the Escrow Participants' Representative shall request that the Independent Expert deliver to Parent and the Escrow Participants' Representative, as promptly as practicable but in no event later than 45 days after its retention, a report which sets forth its resolution of the disputed items and amounts and its calculation of Closing Working Capital. The decision of the Independent Expert shall be final, conclusive and binding on the parties. The costs and expenses of the Independent Expert shall be allocated between Parent and the Escrow Participants' Representative based upon the percentage which the portion of the contested amount not awarded to each such Party bears to the amount actually contested by such Party; provided that the portion allocated to the Escrow Participants' Representative shall be recoverable only from the Indemnity Escrow Fund and/or the Working Capital Escrow Fund, and the Escrow Participants' Representative shall not be personally liable therefor. Each of the Parent and the Escrow Participants' Representative agrees to execute, if requested by the Independent Expert, a reasonable engagement letter, including customary indemnities in favor of the Independent Expert.

2.3     Adjustment of Merger Consideration.

(a)     "Final Working Capital" means the Closing Working Capital (i) as shown in the Closing Working Capital Statement delivered by Parent to the Escrow Participants' Representative pursuant to Section 2.2(a), if no Notice of Objection with respect thereto is timely

delivered by the Escrow Participants' Representative to Parent pursuant to Section 2.2(b); or (ii) if a Notice of Objection is so delivered, (A) as agreed by Parent and the Escrow Participants' Representative pursuant to Section 2.2(c) or (B) in the absence of such agreement, as shown in the Independent Expert's calculation delivered pursuant to Section 2.2(c).

(b)    Parent shall be entitled to receive a distribution from the Working Capital Escrow Fund, as an adjustment to the Merger Consideration, equal to the positive amount, if any, by which Final Working Capital is less than $-4,900,000 (i.e., negative $4,900,000), together with interest from and including the Closing Date to, but excluding, the date of payment at a rate per annum (the "Interest Rate") equal to the Prime Rate as published in *The Wall Street Journal*, Eastern Edition in effect from time to time during the period from the Closing Date to the date of payment (the "Deficit Amount"). The Escrow Participants shall be entitled to receive a distribution from Parent (from Parent funds other than and in addition to those constituting the Working Capital Escrow Fund), as an adjustment to the Merger Consideration, equal to the amount, if any, by which Final Working Capital is greater than $-4,900,000 (i.e., negative $4,900,000), together with interest from and including the Closing Date to, but excluding, the date of payment at the Interest Rate in effect from time to time during the period from the Closing Date to the date of payment (the "Surplus Amount"). In the case of any payments required for either a Deficit Amount or Surplus Amount pursuant to this Section 2.3(b), interest on such payments shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed, without compounding. Any amounts remaining in the Working Capital Escrow Fund after such distribution (or the entire amount of the Working Capital Escrow Fund if no distribution was required to be made to Parent) shall be released to the Escrow Participants pursuant to Section 2.4(b) and, for the avoidance of doubt, the distribution of the funds held in the Working Capital Escrow Fund shall be in addition to and not in lieu of any payments Parent is required to make under this Section 2.3 in connection with any Surplus Amount. Each of Parent and the Escrow Participants' Representative shall take all actions promptly that are necessary to authorize the distributions required pursuant to this Section 2.3(b). Any Surplus Amount shall be paid by Parent to the Escrow Agent for further distribution to the Escrow Participants pursuant to Section 2.4(b).

(c)    Any rights accruing to Parent under this Section 2.3 shall be in addition to and independent of the rights to indemnification under Article VIII. Any payments made to any party under this Section 2.3 shall not be subject to the terms of Article VIII.

2.4    Effect on Company Capital Stock, Company Stock Options and Warrants.

(a)    At the Effective Time, by virtue of the Merger and without any further action on the part of Parent, Merger Sub, the Company or any Company Securityholder:

(i)    Cancellation of Treasury Stock. Each Company Share that is owned by the Company (as treasury stock) or any wholly-owned Subsidiary of the Company immediately prior to the Effective Time shall automatically be cancelled and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(ii)    Conversion of Merger Sub Common Stock. Each issued and outstanding share of common stock of Merger Sub shall be converted into one fully paid and

nonassessable share of common stock of the Surviving Corporation.

          (iii)    <u>Conversion of Company Shares</u>. Subject to Section 2.5, each issued and outstanding Company Share (other than shares to be cancelled in accordance with Section 2.4(a)(i)) shall be cancelled, as of the Effective Time, and the holder thereof shall be entitled to receive the consideration set forth beside such holder's name on <u>Schedule 2.1</u> hereto, which amount shall be allocated in the manner set forth in the Company's Articles of Incorporation in effect on the date hereof, plus such holder's pro rata portion of the Surplus Amount, if any, contemplated by Section 2.3(b). At the Effective Time, all such Company Shares shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of a certificate representing any such Company Shares shall cease to have any rights with respect thereto, except the right to receive the consideration to which such holder is entitled pursuant to this Section 2.4(a)(iii).

          (iv)    <u>Cancellation of Options</u>.

          (A)    At the Effective Time of the Merger, each unexpired Unvested Company Option outstanding immediately prior to the Effective Time of the Merger shall, together with the Company Stock Option Plan and agreements thereunder, be assumed by Parent (an "<u>Assumed Company Option</u>"). The terms of the Company Stock Option Plan and agreements and the Unvested Company Options outstanding thereunder permit the assumption of those options by the Parent as provided in this Section 2.4(a)(iv), without consent or approval of the holders of those options, the Company's shareholders or otherwise. Each Unvested Company Option so assumed by Parent will continue to have, and be subject to, the same terms and conditions set forth in the documents governing such Unvested Company Option immediately prior to the Effective Time of the Merger, except that: (A) such Assumed Company Option will be exercisable for that number of Ordinary Shares of the Parent ("<u>Parent Ordinary Shares</u>"), rounded down to the nearest whole share, equal to the product of (x) the number of shares of Company Common Stock that were purchasable under such Assumed Company Option immediately prior to the Effective Time of the Merger and (y) the quotient obtained by dividing (I) the amount of Merger Consideration payable to a single share of Company Common Stock as set forth on <u>Schedule 2.1</u> hereto (the "<u>Merger Consideration Per Common Share</u>") by (II) the Parent Fair Market Value (such quotient being referred to as the "<u>Exchange Ratio</u>"). For purposes of this Agreement, "<u>Parent Fair Market Value</u>" means the volume weighted average closing selling price per share of the Parent Ordinary Shares as quoted on the London Stock Exchange for the ten (10) trading days ending on the trading date immediately preceding the Closing Date (as converted to U.S. Dollars at the Currency Exchange Rate as quoted in the New York edition of *The Wall Street Journal* at the Effective Time). The per share exercise price for the Parent Ordinary Shares issuable upon exercise of such Assumed Company Options will be equal to the quotient obtained by dividing (x) the exercise price per share for the shares of Company Common Stock under such Assumed Company Option immediately prior to the Effective Time of the Merger by (y) the Exchange Ratio, and rounding up to the next whole cent. Consistent with the terms of the Company Options and the documents governing the Company Options, but subject to Section 3.1(c)(viii) of the Disclosure Schedule, the Merger will not terminate or accelerate any Company Option or any right of exercise, vesting or repurchase relating thereto with respect to the Parent Ordinary Shares or shares of Company Common Stock acquired upon exercise of the Company Option. Holders of Company Options will not be

entitled to acquire shares of Company Common Stock following the Merger.

(B)     Holders of Vested Company Options may elect to exercise such options prior to the Effective Time of the Merger and receive the Merger Consideration Per Common Share by providing notice of such exercise and payment of the exercise price thereof to the Company at any time prior to the Effective Time of the Merger. In the event that any holder of Vested Company Options does not exercise such Vested Company Options prior to the Effective Time of the Merger, at the Effective Time of the Merger such Vested Company Options shall be cancelled and converted into the right to receive in cash the dollar amount, if any, determined by multiplying (A) the excess of the Merger Consideration Per Common Share over the exercise price per share of Company Common Stock in effect under each such Vested Company Option by (B) the number of vested shares of Company Common Stock subject to such Vested Company Option.

(C)     Prior to or promptly following the Effective Time of the Merger, Parent shall issue to each holder of an Assumed Company Option a document evidencing the assumption of that Unvested Company Option by Parent. The right to receive an Assumed Company Option may not be assigned or transferred.

(D)     All outstanding rights of Company which it may hold immediately prior to the Effective Time to repurchase unvested shares of Company Common Stock (the "Repurchase Options") shall continue in effect following the Merger and shall thereafter continue to be exercisable by Parent upon the same terms and conditions in effect immediately prior to the Effective Time, except that the number of shares purchasable pursuant to the Repurchase Options and the purchase price per share shall be adjusted to reflect the Exchange Ratio.

(v)     Cancellation of Warrants. Each Warrant which is outstanding immediately prior to the Closing Date shall not be assumed by Parent and, accordingly, at the Effective Time, shall terminate and cease to be outstanding immediately upon the Effective Time subject, in the case of Warrants that will not, pursuant to their terms, expire and terminate prior to the Closing, to obtaining an agreement between the Company and the holder of each such Warrant executed prior to, and effective on, the Closing Date hereof (such agreements, the "Warrant Cancellation Agreements"). The holders of the Warrants shall cease to have any further right or entitlement to acquire shares of common stock of the Company or any shares of capital stock of Parent under their cancelled Warrants. In exchange for each such cancelled Warrant, the holder shall be entitled to receive the consideration set forth beside such holder's name on Schedule 2.1 hereto, subject to the collection of all applicable withholding Taxes.

(b)     Distribution of Amounts to Escrow Participants. Whenever funds are to be released to the Escrow Agent for further distribution to the Escrow Participants pursuant to this Agreement, the Escrow Agent shall be instructed to distribute such amounts to Escrow Participants that have returned the appropriate Security Documentation pursuant to Section 2.6(b), on a pro rata basis, determined based upon the ratio of the Closing Consideration that such Escrow Participant is entitled to receive bears to the aggregate Closing Consideration that all Escrow Participants are entitled to receive.

2.5    <u>Dissenting Shares</u>.

(a)    Notwithstanding anything in this Agreement to the contrary, Company Shares issued and outstanding immediately prior to the Effective Time that are held by any holder who (a) has not voted such Company Shares, or executed a written consent, in favor of the Merger, (b) is entitled to demand and properly demands appraisal of such shares pursuant to Section 1301 of the CGCL ("<u>Section 1301</u>"), and complies in all respects with the provisions of Section 1301, and (c) has not effectively withdrawn or lost the right to demand relief as a dissenting shareholder under the CGCL as of the Effective Time (the "<u>Dissenting Shares</u>"), shall not be converted into the right to receive the Merger Consideration as provided in Section 2.4(a), but instead such holder of Dissenting Shares shall only be entitled to payment of the fair value of such shares in accordance with the provisions of Section 1301. At the Effective Time, all Dissenting Shares shall automatically be cancelled and shall cease to exist or be outstanding, and each holder of Dissenting Shares shall cease to have any rights with respect thereto, except such rights as are granted under Section 1301. Notwithstanding the foregoing, if any such holder shall fail to perfect or otherwise shall waive, withdraw or lose the right to appraisal under Section 1301, or a court of competent jurisdiction shall determine that such holder is not entitled to the relief provided by Section 1301, then the rights of such holder under Section 1301 shall cease to exist and such Dissenting Shares shall be deemed to have been converted at the Effective Time into, and shall have become, the right to receive such holder's Merger Consideration as provided in Section 2.4(a).

(b)    The Company shall serve prompt notice to Parent of any demands for appraisal of any shares of Company Common Stock, and Parent shall have the right to participate in and, subject to applicable law, direct all negotiations and proceedings with respect to such demands. The Company shall not, without the prior written consent of Parent, make any payment with respect to, or settle or offer to settle, any such demands, or agree to do any of the foregoing.

2.6    <u>Deposit of Funds by Parent; Exchange of Certificates</u>.

(a)    <u>Paying Representative</u>. Prior to the Effective Time, Parent shall designate a bank or trust company of recognized standing that is reasonably acceptable to the Company to act as paying representative (the "<u>Paying Representative</u>"). At the Closing, Parent shall deposit, or shall cause to be deposited, with the Paying Representative the Closing Consideration (such cash, together with any dividends or distributions with respect thereto, being hereinafter referred to as the "<u>Payment Fund</u>"). The Paying Representative shall make the cash payments provided for in Section 2.4(a) out of the Payment Fund. The Payment Fund shall not be used for any other purpose. Any portion of the Payment Fund that has not been distributed pursuant to Section 2.6(b) on or prior to the date which is one year after the Effective Time shall be turned over to Parent, and any former Company Securityholders who have not theretofore complied with this Article II shall thereafter look to Parent for payment of the consideration payable pursuant to Section 2.4(a) with respect thereto; <u>provided</u>, <u>however</u>, that any and all interest earned at any time on the Payment Fund shall inure to the benefit of, and belong to, Parent.

(b)    <u>Exchange Procedure</u>. Promptly following the Effective Time, the Surviving Corporation shall cause the Paying Representative to mail to each Company Securityholder set forth on <u>Schedule 2.1</u> (i) a letter of transmittal (which shall specify that

delivery shall be effected, and risk of loss and title to the Security Documentation held by such Person shall pass, only upon the proper delivery of the Security Documentation, to the Paying Representative and shall be in a form and have such other provisions as Parent may reasonably specify, and (ii) instructions as specified by the Paying Representative or Parent for use in effecting the surrender of the Security Documentation in exchange for the consideration to which such holder is entitled pursuant to Section 2.4(a). Upon surrender of Security Documentation for cancellation to the Paying Representative or to such other agent or agents as may be appointed by Parent, together with (x) such letter of transmittal, duly completed and executed, and such other customary documents as may reasonably be required by the Paying Representative, and (y) and delivery by the Company Securityholder of an executed signature page to the Representative Agreement, the holder of such Security Documentation shall be entitled to receive in exchange therefor, and the Paying Representative shall promptly distribute to such holder, the amount of cash to which such holder is entitled pursuant to Section 2.4(a), and the Security Documentation so surrendered shall forthwith be cancelled. In the event of a transfer of ownership of Company Shares or Warrants that is not registered in the transfer records of the Company, payment may be made to a Person other than the Person in whose name the Security Documentation so surrendered is registered, if such Security Documentation shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such payment shall pay any transfer or other Taxes required by reason of the payment to a Person other than the registered holder of such Security Documentation or establish to the satisfaction of Parent that such Tax has been paid or is not applicable. Until surrendered as contemplated by this Section 2.6(b), such Security Documentation shall be deemed at any time after the Effective Time to represent only the amount of cash to which such holder is entitled pursuant to Section 2.4(a), without interest. No interest will be paid or will accrue on the cash payable pursuant to Section 2.4(a).

(c)    Escrow Agent. At the Effective Time or as soon as practicable thereafter, Parent shall cause to be delivered to U.S. Bank, as escrow agent (the "Escrow Agent") the following amounts in cash:

(i)    $20,500,000 (the "Indemnity Escrow Amount"). The Indemnity Escrow Amount together with all earnings thereon (the "Indemnity Escrow Fund") shall be held in escrow by the Escrow Agent in accordance with the Escrow Agreement in the form attached as Exhibit F hereto (the "Escrow Agreement"). The Indemnity Escrow Fund (other than the Representative Reserve Amount, which amount shall only be available to reimburse the Escrow Participants' Representative as described in Section 8.7) shall be available to compensate Parent for certain damages as provided in Article VIII. To the extent not used for such purposes, the Indemnity Escrow Fund shall be released to the Escrow Agent for further release to the Escrow Participants pursuant to Section 2.6(b); and

(ii)    $4,000,000 (the "Working Capital Escrow Amount"). The Working Capital Escrow Amount together with all earnings thereon (the "Working Capital Escrow Fund") shall be held in escrow by the Escrow Agent in accordance with the Escrow Agreement. The Working Capital Escrow Fund shall be available to compensate Parent for a Deficit Amount, if any, as provided in Section 2.3(b). To the extent not used for such purposes, the Working Capital Escrow Fund shall be released to the Escrow Agent for further distribution to the Escrow Participants pursuant to Section 2.4(b).

2.7    <u>No Further Ownership Rights</u>. All cash paid upon the surrender of Security Documentation in accordance with the terms of this Article II shall be deemed to have been paid in full satisfaction of all rights pertaining to the Company Shares, Options and Warrants theretofore represented by such Security Documentation. At the close of business on the day of the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the Company Shares that were outstanding immediately prior to the Effective Time.

2.8    <u>No Liability</u>. None of Parent, Merger Sub, the Company or the Paying Representative shall be liable to any Person in respect of any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

2.9    <u>Lost, Stolen or Destroyed Certificates</u>. If any Security Documentation shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Security Documentation to be lost, stolen or destroyed and, if required by Parent, the posting by such Person of a bond in such reasonable amount as Parent may direct as indemnity against any claim that may be made against it with respect to such Security Documentation, the Paying Representative will pay to the holder of such lost, stolen or destroyed Security Documentation the consideration to which such holder is entitled with respect to such Certificate pursuant to Section 2.4(a).

2.10    <u>Withholding Rights</u>. Parent and Paying Representative shall deduct and withhold from the consideration otherwise payable pursuant to Section 2.4(a) of this Agreement to any Company Securityholders such amounts as it is required to deduct and withhold with respect to the making of such payment under the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, or any provisions of any other Tax Law. To the extent that amounts are so deducted and withheld by Parent or Paying Representative, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Company Securityholder in respect to which such deduction and withholding were made by Parent or Paying Representative.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

3.1    <u>Representations and Warranties of the Company</u>. The Company represents and warrants to Parent and Merger Sub that, except as set forth in the written disclosure schedule prepared by the Company which is dated as of June 19, 2007 and arranged in sections corresponding to the numbered and lettered sections contained in this Section 3.1 and is being concurrently delivered to Parent in connection herewith (the "<u>Disclosure Schedule</u>"; <u>provided, however,</u> that disclosure in any section of the Disclosure Schedule shall be deemed to have been set forth in all other applicable sections of the Disclosure Schedule where the applicability of such disclosure to such other sections is reasonably apparent notwithstanding the omission of any cross-reference to such other section in the Disclosure Schedule; <u>provided, further,</u> that the mere listing of the name of a Contract, the parties thereto and the date thereof shall not make the applicability of such disclosure "reasonably apparent" for purposes of the immediately preceding proviso unless such listing contains other descriptive language making the applicability of such

disclosure reasonably apparent), as of June 19, 2007:

      (a)    <u>Organization, Standing and Corporate Power</u>.

      (i)    Each of the Company and its Subsidiaries is a corporation or other legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized and has the requisite corporate or other power, as the case may be, and authority to carry on its business as now being conducted. Each of the Company and its Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties or operations makes such qualification or licensing necessary, other than (A) in any jurisdiction that does not recognize the concept of good standing, and (B) in such jurisdictions where the failure to be so qualified or licensed or to be in good standing would not reasonably be expected to have a Material Adverse Effect on the Company.

      (ii)    The Company has delivered or Made Available to Parent, prior to the execution of this Agreement, copies of (i) its Articles of Incorporation and Bylaws, in each case as amended to the date of this Agreement, and (ii) all the existing written consents and approved written minutes of the meetings of its shareholders, its Board of Directors and each committee of its Board of Directors with respect to the Company held between June 1, 2003 and the date of this Agreement. The Company has complied with and is not in default under its Articles of Incorporation or Bylaws.

      (b)    <u>Subsidiaries</u>.

      (i)    Section 3.1(b) of the Disclosure Schedule sets forth a list of the Subsidiaries of the Company and sets forth with respect to each such Subsidiary the jurisdiction of formation, the authorized and outstanding capital stock of such Subsidiary and the owner(s) of record of such outstanding capital stock. All the outstanding shares of capital stock of, or other equity or voting interests in, each such Subsidiary have been validly issued and are fully paid and nonassessable and are owned by the Company or a wholly-owned subsidiary of the Company, free and clear of all mortgages, pledges, assessments, adverse claims, liens, charges, security interests and other encumbrances of any kind or nature whatsoever (collectively, "Liens"), except for Permitted Liens. Except for the capital stock of, or other equity or voting interests in, those Subsidiaries listed in Section 3.1(b)(i) of the Disclosure Schedule, and except for marketable securities, the Company does not own, directly or indirectly, any capital stock of, or other equity or voting interests in, any other Person. The Company has delivered or Made Available to Parent with respect to each Subsidiary complete and correct copies of the Charter Documents (or other similar organizational documents) of such Subsidiary, in each case as in effect on the date hereof. "Charter Documents" means, with respect to any entity, the articles or certificate of incorporation, by-laws, articles of organization, limited liability company agreement, partnership agreement, formation agreement, joint venture agreement or other similar organizational documents of such entity (in each case, as amended).

      (ii)    Other than the shares of capital stock set forth in the Disclosure Schedule, no Subsidiary of the Company has outstanding securities of any kind. No Subsidiary of the Company is party to any Contract obligating such Subsidiary, directly or indirectly, to

issue any additional securities and there is no circumstance or condition that may give rise to a claim by any Person that such Person is entitled to acquire the securities of any such Subsidiary. No Subsidiary of the Company has outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights.

(iii)    No Subsidiary of the Company has outstanding any bonds, debentures, notes or other obligations or debt securities the holders of which have the right to vote (or convertible into, or exercisable or exchangeable for, securities having the right to vote) on any matter.

(iv)    Other than the Subsidiaries set forth in the Disclosure Schedule, neither the Company nor any Subsidiary of the Company, directly or indirectly, owns any securities or other interest in any corporation, partnership, joint venture or other business association or entity, or to provide funds to or make any investment.

(v)    There are no obligations, contingent or otherwise, of the Company or any Subsidiary of the Company to provide funds to or make an investment (in the form of a loan, capital contribution or otherwise) in any entity.

(c)    Capital Structure.

(i)    The authorized capital stock of the Company consists of (A) 245,700,000 shares of Company Common Stock, of which 34,579,979 shares are issued and outstanding, and (B) 132,125,000 shares of Company Preferred Stock, 6,350,000 of which are designated Series A Preferred Stock, and 6,325,706 of which are issued and outstanding, 6,300,000 of which are designated Series B-1 Preferred Stock, and 6,250,000 of which are issued and outstanding, 15,375,000 of which are designated Series C-1 Preferred Stock, and 6,278,601 of which are issued and outstanding, 4,900,000 of which are designated Series D-1 Preferred Stock, and 3,523,036 of which are issued and outstanding, 14,000,000 of which are designated Series E Preferred Stock, and 12,841,796 of which are issued and outstanding, 35,100,000 of which are designated Series F Preferred Stock, and 35,087,713 of which are issued and outstanding, and 50,100,000 of which are designated Series G Preferred Stock, and 50,000,000 of which are issued and outstanding. Schedule 2.1 contains a true and complete list of the record holders of the Company Shares and sets forth the full name, number and class and series of Company Shares owned by each and, with respect to shares of Company Preferred Stock, sets forth the number of shares of Company Common Stock into which such shares of Company Preferred Stock are convertible.

(ii)    The Company has reserved 61,025,716 shares of Company Common Stock for issuance to employees, consultants and directors pursuant to the Company Stock Option Plan, of which (1) 44,708,314 shares are subject to outstanding unexercised Company Stock Options thereunder, (2) no shares issued pursuant to exercises of Company Stock Options are unvested and subject to repurchase rights in favor of the Company and (3) 7,040,742 shares are reserved for issuance upon the exercise of additional Company Stock Options that may be granted thereunder in accordance with the limitations and restrictions of Section 4.1(d) of this Agreement. The Company has also reserved (A) 5,799,993 shares of Company Common Stock issuable upon the exchange of all outstanding shares of Common

Exchangeable Stock (of which a total of 5,799,993 shares of Common Exchangeable Stock are issued and outstanding as of the date of this Agreement); (B) 5,999,995 shares of Series C-1 Preferred issuable upon the exchange of all outstanding shares of Preferred Exchangeable Stock (of which a total of 5,999,995 shares of Preferred Exchangeable Stock are issued and outstanding as of the date of this Agreement); (C) 10,994,584 shares of Company Common Stock issuable upon exercise of warrants to purchase shares of Company Common Stock; and (D) 1,100,000 shares of Series E Preferred issuable upon exercise of warrants to purchase shares of Series E Preferred.

   (iii) Section 3.1(c)(iii) of the Disclosure Schedule sets forth with respect to all Company Stock Options as of the date of this Agreement (except for items (vi) and (vii), which shall be as of a date within two Business Days of the date of this Agreement): (i) the name of the holder of each such Company Stock Option; (ii) the date on which each such Company Stock Option was granted; (iii) the term of each such Company Stock Option; (iv) the total number of shares of Company Common Stock that were originally subject to each such Company Stock Option; (v) the number of shares of Company Common Stock that remain subject to each such Company Stock Option; (vi) the number of such Company Stock Options that remain unvested ("Unvested Company Options"); (vii) the number of such Company Stock Options that are vested (including any such Company Stock Options that vest as a result of the consummation of the Merger) ("Vested Company Options"); (viii) the vesting schedule for each such Company Stock Option; (ix) the exercise price per share of Company Common Stock purchasable under each such Company Stock Option; and (x) whether each such Company Stock Option has been designated an "incentive stock option" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"). Not less than two Business Days prior to the Closing Date, the Company will have delivered to Parent a true and correct revision to Section 3.1(c)(iii) of the Disclosure Schedule that will set forth, as of the Closing Date, the information referenced in (i) through (x) of the immediately preceding sentence. The Company has delivered or Made Available to Parent true and correct copies of the Company Stock Option Plan and the forms of all agreements and instruments relating to or issued thereunder and such agreements and instruments have not been amended, modified or supplemented and there are no agreements to amend, modify or supplement such agreements or instruments in any case from the form provided to Parent.

   (iv) Section 3.1(c)(iv) of the Disclosure Schedule sets forth a list with respect to each warrant (each, a "Warrant" and collectively, the "Warrants") to purchase shares of Company Common Stock and Company Preferred Stock (collectively, the "Company Shares") that is outstanding as of the date hereof: (i) the name of the holder of such Warrant; (ii) the date on which such Warrant was issued; (iii) the total number of Company Shares that are subject to such Warrant; and (iv) the exercise price per Company Share purchasable under such Warrant. The Company has given all requisite notices regarding the Merger and the transactions contemplated hereby to each holder of a Warrant. As of the Closing, (i) no Warrants will be outstanding, and (ii) no former holder of a Warrant will have any right to purchase any Capital Stock of the Company, any subsidiary of the Company, Parent or Merger Sub.

   (v) As of the date of this Agreement, there are no issued and outstanding shares of Company Common Stock or other securities which are subject to repurchase by the Company or forfeiture in the event the holders of those shares or securities

terminate their service relationship with the Company or its Subsidiaries prior to vesting in such shares or securities or in the event any other vesting provisions applicable to those shares or securities are not satisfied.

(vi)    All outstanding Company Shares are, and all shares of Company Common Stock reserved for issuance under the Company Stock Option Plan and all shares of Company Shares reserved for issuance under the Warrants shall be, upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable, duly authorized, validly issued, fully paid and nonassessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the CGCL, the Company's Charter Documents or any Contract to which the Company is a party or otherwise bound, except to the extent that any such violation would not reasonably be expected to have a Material Adverse Effect on the Company. None of the outstanding shares of the Company's capital stock has been issued in violation of any federal or state securities Laws, except to the extent that any such violation would not reasonably be expected to have a Material Adverse Effect on the Company. All of the outstanding shares of capital stock of each of the Company's Subsidiaries are duly authorized, validly issued, fully paid and nonassessable, and all such shares (other than directors' or nominees' shares in the case of foreign Subsidiaries) are owned by the Company or a Subsidiary of the Company free and clear of all Liens, other than Permitted Liens. There are no accrued and unpaid dividends with respect to any outstanding shares of capital stock of the Company or any of its Subsidiaries.

(vii)    Except for the Company Stock Option Plan, that certain Sixth Amended and Restated Shareholders' Rights Agreement entered into by and between the Company and the other parties listed on the signature pages thereto on August 2, 2004 (the "Shareholders' Rights Agreement") and that certain Sixth Amended and Restated Right of First Refusal and Co-Sale Agreement entered into by and between the Company and the other parties listed on the signature pages thereto on August 2, 2004, there are no agreements to which the Company is a party or by which it is bound with respect to the voting (including voting trusts or proxies), registration under the Securities Act, or sale or transfer (including agreements relating to pre-emptive rights, rights of first refusal, co-sale rights or "drag-along" rights) of any securities of the Company or its Subsidiaries. To the Knowledge of the Company, there are no agreements in effect as of the date of this Agreement among other parties, to which the Company is not a party and by which it is not bound, with respect to the voting (including voting trusts or proxies) or sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag-along" rights) of any securities of the Company or its Subsidiaries.

(viii)    Except as described in this Section 3.1(c) and the other Company Common Stock Equivalents that are disclosed in Section 3.1(c)(viii) of the Disclosure Schedule (the Company Common Stock Equivalents required to be disclosed pursuant to this Section 3.1(c)(viii), the "Other Purchase Rights"), no capital stock of the Company or any of its Subsidiaries or any security convertible or exchangeable into or exercisable for such capital stock, is issued, reserved for issuance or outstanding as of the date of this Agreement. Except as described in this Section 3.1(c), there are no options, preemptive rights, warrants, calls, rights, commitments or agreements of any kind to which the Company or any of its Subsidiaries is a party, or by which the Company or any of its Subsidiaries is bound, obligating the Company or

any of it Subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock of the Company or any of its Subsidiaries or obligating the Company or any of its Subsidiaries to grant, extend or accelerate the vesting of, or otherwise amend or enter into, any such option, warrant, call, right, commitment or agreement. Except for the Company's repurchase rights with respect to unvested shares issued under the Company Stock Option Plan, there are no rights or obligations, contingent or otherwise (including rights of first refusal in favor of the Company), of the Company or any of its Subsidiaries, to repurchase, redeem or otherwise acquire any shares of capital stock of the Company or any of its Subsidiaries or to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in any such Subsidiary or any other Person. Except for the Shareholders' Rights Agreement, there are no registration rights or other agreements or understandings to which the Company or any of its Subsidiaries is a party or by which it or they are bound with respect to any capital stock of the Company or any of its Subsidiaries.

(ix)    Except for the repurchase at cost of shares of Company Common Stock from employees, directors or consultants of the Company and its Subsidiaries in connection with the termination of their service ("Permitted Repurchases"), the Company has not repurchased or otherwise reacquired any of its securities. The repurchase of any such securities was duly approved and authorized by the Board of Directors and complied in all respects with applicable Law, and the Company has no liability, contingent or otherwise, to make any payments with respect to any such repurchased securities other than the liability for the repurchase price. There are no obligations, contingent or otherwise, of the Company to repurchase, redeem or otherwise acquire any of its securities. There are no declared or accrued unpaid dividends with respect to any of the Company's securities.

(x)    The Company does not have outstanding or authorized any stock appreciation, phantom stock, profit participation, or similar rights.

(xi)    The Company does not have outstanding any bonds, debentures, notes or other obligations or debt securities the holders of which have the right to vote (or convertible into, or exercisable or exchangeable for, securities having the right to vote) on any matter.

(xii)    Prior to the Closing, all Preferred Exchangeable Shares and Common Exchangeable Shares of 2040253 Ontario Inc., a subsidiary of the Company ("Ontario"), will have been acquired and will continue to be owned by either Ontario or by the Company's wholly-owned subsidiary 3086025 Nova Scotia Company, in either case, in exchange for shares of the Company's Series C-1 Preferred Stock and Company Common Stock, respectively (the "Exchangeable Share Conversion"), and such Series C-1 Preferred Stock and Common Stock will be cancelled pursuant to Section 2.4. As of the Closing (i) no former holders of such Preferred Exchangeable Shares or Common Exchangeable Shares will have any rights to vote any shares of Capital Stock of the Company or any securities of any of the Company's Subsidiaries or Merger Sub or any other rights with respect thereto, and (ii) Ontario will be a wholly-owned subsidiary of the Company.

(d)    Authority; Noncontravention.

(i)      The Company has the requisite corporate power and authority to execute and deliver this Agreement and the Transaction Documents and to consummate the transactions contemplated hereunder and thereunder, subject, in the case of approving this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger, to obtaining the Company Shareholder Approval. Assuming the accuracy of the representations and warranties of Parent set forth in Section 3.2(b)(i), the execution and delivery of this Agreement, and the Transaction Documents, when executed and delivered at the Closing, by the Company and the consummation by the Company of the transactions contemplated hereunder and thereunder have been duly authorized by all necessary corporate action on the part of the Company and no other corporate authorizations or approvals on the part of the Company are necessary to approve this Agreement and the Transaction Documents or to consummate the transactions contemplated hereunder and thereunder, subject, in the case of approving this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger, to obtaining the Company Shareholder Approval. This Agreement has been, and the Transaction Documents will be, duly executed and delivered by the Company and constitutes or, in the case of the Transaction Documents, will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms subject to (A) applicable bankruptcy, insolvency, fraudulent transfer and conveyance, moratorium, reorganization, receivership and similar Laws relating to or affecting the enforcement of the rights and remedies of creditors generally and (B) principles of equity (regardless of whether considered and applied in a proceeding in equity or at law).

(ii)     The affirmative vote of the holders of (A) a majority of the outstanding shares of Company Common Stock, (B) a majority of the outstanding shares of Company Preferred Stock, and (C) a majority of the outstanding shares of the Company's Series F Preferred Stock, each, as of the record date established for purposes of determining the Company Shareholders entitled to vote on the Merger, voting together as a separate class, at a duly called meeting of the Company Shareholders or by means of an action by written consent, in favor of adopting this Agreement (the "Company Shareholder Approval") is the only vote of the holders of any class or series of the Company's capital stock necessary to approve and adopt this Agreement or the Merger or any transaction contemplated hereby.

(iii)    The Board of Directors of the Company, at a meeting duly called and held at which all directors of the Company who were present duly and unanimously adopted resolutions or by means of an action by unanimous written consent of the Board of Directors of the Company (the "Company Board Approval") (A) approving this Agreement, the Transaction Documents, the Merger and the other transactions contemplated hereby, (B) determining that it is advisable and in the best interests of the Company and its shareholders that the Company enter into this Agreement and the Transaction Documents and consummate the Merger on the terms and subject to the conditions set forth in this Agreement, (C) directing that this Agreement be submitted to a vote for approval and adoption by the Company's shareholders and (D) recommending that the Company's shareholders adopt this Agreement, which resolutions have not been rescinded, modified or withdrawn in any way.

(iv)     The execution and delivery of this Agreement and the Transaction Documents, when executed and delivered at the Closing, by the Company and the consummation by the Company of the transactions contemplated hereunder and thereunder and compliance by

the Company with the provisions hereof and thereof, do not and will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in termination, cancellation or acceleration of any material obligation of the Company or any of its Subsidiaries under, or give rise to a loss of a material benefit under, or result in the creation of any Lien (other than Permitted Liens) in or upon any of the properties or assets of the Company or any of its Subsidiaries under, or give rise to any material increased, additional, accelerated or guaranteed rights or entitlements under, (A) any provision of the Charter Documents of the Company or any of its Subsidiaries, (B) any Contract to which the Company or any of its Subsidiaries is a party or any of their respective properties or assets is subject or (C) subject to the governmental filings and other matters referred to in Section 3.1(d)(iv), any Law or Order, in each case, applicable to the Company or any of its Subsidiaries or their respective properties or assets; other than, in the case of clauses (B) and (C), any such conflicts, violations, breaches, defaults, rights, results, losses, Liens or entitlements that would not reasonably be expected to have a Material Adverse Effect on the Company. Section 3.1(d)(iv) of the Disclosure Schedule sets forth all consents, waivers, assignments and other approvals and actions that are required in connection with the transactions contemplated by this Agreement under any Material Contract to which the Company or any of its Subsidiaries is a party (collectively, "Consents") in order to preserve all rights of, and benefits to, the Company and its Subsidiaries thereunder.

(v)     No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any domestic or foreign (whether national, federal, state, provincial, local or otherwise) government or any court, administrative agency or commission or other governmental or regulatory authority or agency, domestic or foreign (each, a "Governmental Entity"), is required to be made or obtained by the Company or any of its Subsidiaries at or prior to the Effective Time in connection with the execution and delivery of this Agreement and the Transaction Documents by the Company or the consummation by the Company of the transactions contemplated hereby and thereby or compliance by the Company with the provisions hereof and thereof, except for (A) the filing of a premerger notification and report form by the Company under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") or applicable foreign antitrust laws and the expiration or early termination of applicable waiting periods under the HSR Act or applicable foreign antitrust laws, and (B) the filing of the Agreement of Merger with the California Secretary of State and appropriate documents with the relevant authorities of other states or other jurisdictions in which the Company or any of its Subsidiaries is qualified to do business, including such customary filings regarding any change of beneficial ownership or similar filings in foreign jurisdictions that would not reasonably be expected to preclude or materially impede the Company's ability to consummate the transactions contemplated hereby and thereby.

(e)     Financial Statements.

(i)     True and complete copies of the Company's audited consolidated financial statements consisting of the consolidated balance sheet of the Company and its Subsidiaries as at December 31 in each of the years 2004 through 2006 and the related statements of income and retained earnings, shareholders' equity and cash flow, for the years then ended (the "Audited Financial Statements"), and unaudited consolidated financial statements consisting of the balance sheet of the Company and its Subsidiaries as at May 31,

2007 and the related statements of income and retained earnings, shareholders' equity and cash flow for the period then ended (the "Interim Financial Statements" and together with the Audited Financial Statements, the "Financial Statements"), are included in the Disclosure Schedule.

(ii)    The Financial Statements are true, complete and correct in all material respects and have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved, subject, in the case of the Interim Financial Statements, to normal year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements). The Financial Statements are based on the books and records of the Company and its Subsidiaries, and fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the respective dates they were prepared and the results of the operations and cash flows of the Company and its Subsidiaries for the periods indicated. The consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2006 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date" and the consolidated balance sheet of the Company and its Subsidiaries as of May 31, 2007 is referred to herein as the "Interim Balance Sheet" and the date thereof as the "Interim Balance Sheet Date." Each of the Company and its Subsidiaries maintains a standard system of accounting established and administered in accordance with GAAP.

(iii)    Except as set forth in the Financial Statements and except as arising under this Agreement, the Company and its Subsidiaries have no liabilities or obligations of any nature (whether absolute, accrued, asserted or unasserted, contingent or otherwise) ("Liabilities"), except for such liabilities and obligations (A) that have been incurred since the Interim Balance Sheet Date in the Ordinary Course of Business or that are set forth in Section 3.1(e)(iii) of the Disclosure Schedule, and (B) that would not reasonably be expected to have a Material Adverse Effect on the Company.

(iv)    Neither the Company nor any of its Subsidiaries is a party to, or has any commitment to become a party to, any joint venture, partnership agreement or any similar Contract (including any Contract relating to any transaction, arrangement or relationship between or among the Company or any of its Subsidiaries, on the one hand, and any unconsolidated Affiliate, including any structured-finance, special-purpose or limited-purpose entity or Person, on the other hand) where the purpose or intended effect of such arrangement is to avoid disclosure of any material transaction involving the Company or any of its Subsidiaries in the Financial Statements, or any "off balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the SEC).

(v)    Except as disclosed in the Interim Balance Sheet, (A) there is no material outstanding indebtedness for borrowed money of the Company and its Subsidiaries except as permitted by Section 4.1, and (B) there are no guarantees by the Company or any of its Subsidiaries of any material indebtedness of third parties for borrowed money.

(vi)    There are no significant deficiencies or material weaknesses in the design or operation of Company's internal controls which would adversely affect the Company's ability to record, process, summarize and report financial data. There is and has been no fraud,

whether or not material, that involves management or other employees who have a significant role in Company's internal controls.

(f)    <u>Notes and Accounts Receivable</u>. All notes and accounts receivable of the Company and its Subsidiaries shown on the Interim Balance Sheet, or thereafter acquired by the Company or any of its Subsidiaries, have been collected or are current and collectible in the ordinary course (in the case of any such note in accordance with its terms, and in the case of any such account within 90 days after billing) at the aggregate recorded amounts thereof on the Company's books, less the allowance for uncollectible accounts provided on the above-referenced balance sheet, as such allowances may have been adjusted on the Company's books in the Ordinary Course of Business to date, which adjustment, if material, is disclosed in Section 3.1(f) of the Disclosure Schedule. As of the date of this Agreement, no note or receivable of the Company or its Subsidiaries is subject to an asserted counterclaim or setoff that if successful would reasonably be expected to have a Material Adverse Effect on the Company.

(g)    <u>Absence of Certain Changes or Events</u>.

(i)    Except for the transactions contemplated by this Agreement, between the Balance Sheet Date and the date of this Agreement, (A) the Company and its Subsidiaries have conducted their respective businesses only in the Ordinary Course of Business and (B) there has not been (1) any state of facts, change, development, event, effect, condition or occurrence that, individually or in the aggregate, has caused or would reasonably be expected to have, a Material Adverse Effect on the Company; (2) any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to any of the Company's or any of its Subsidiaries' capital stock; (3) any purchase, redemption or other acquisition of any shares of capital stock or other securities of the Company or its Subsidiaries or the issuance of any options, warrants, calls, or rights to acquire such shares or securities, except for Permitted Repurchases; (4) any amendment or modification its Charter Documents; (5) any split, combination or reclassification of any of the Company's or any of its Subsidiaries' capital stock or any issuance or the authorization of any issuance of any other securities in respect of, in lieu of or in substitution for shares of the Company's capital stock or other securities of the Company or any of its Subsidiaries (other than shares of Company Common Stock issuable upon the exercise of outstanding Company Stock Options or other awards under the Company Stock Option Plan, all of which are detailed on Section 3.1(c)(iii) of the Disclosure Schedule); (6) any incurring of any material Liability or creating or assuming any Lien on any asset, except for Permitted Liens, Liens arising under lease financing arrangements existing as of the Balance Sheet Date and Liens for taxes not yet due and payable with respect to which the Company maintains adequate reserve; (7) any alteration or modification of any term of any outstanding securities; (8) any loan, advance or capital contribution to, or investment in, any Person other than travel loans or advances in the Ordinary Course of Business; (9) any sale, transfer, pledge or assignment of any Intellectual Property owned by the Company (excluding non-exclusive licenses thereto granted in the Ordinary Course of Business), and there has been no material reduction in the value of, any Company Intellectual Property; (10) any labor dispute, other than individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any employees of the Company or any of its Subsidiaries; (11) any material damage, destruction or loss with respect to the property and assets of the Company or any of its Subsidiaries, whether or not covered by insurance; (12) any material violation of or conflict with

any Law to which the business, operations, assets or properties of the Company or any of its Subsidiaries are subject; (13) any material change in financial or Tax accounting methods, principles or practices by the Company or any of its Subsidiaries, except insofar as may have been required by a change in GAAP or applicable Law; (14) any material election with respect to Taxes by the Company or any of its Subsidiaries or any settlement or compromise of any material Tax liability or refund; (15) any revaluation of the Company's or any of its Subsidiaries' material assets; (16) any grants of material refunds, credits, rebates or other allowances by the Company to any end user, customer, reseller or distributor, in each case, other than in the Ordinary Course of Business; or (17) any agreement, whether in writing or otherwise, to do any of the foregoing.

(ii)    Except for the transactions contemplated by this Agreement, between April 30, 2007, and the date of this Agreement, there has not been (A) any granting by the Company or any of its Subsidiaries to any current or former director, officer, employee or consultant of (1) any increase in or improvement to compensation, bonus, pension, insurance or other benefits (including grants of stock options, stock appreciation rights or other stock-based awards) or any such granting of any type of compensation or benefits to any current or former director, officer, employee or consultant not previously receiving or entitled to receive such type of compensation or benefit, or (2) the right to receive any severance or termination pay, or increases therein (other than in both instances (1) and (2) increases made as required by Law, or severance pay required by the Standard UK/Canada Employment Agreements); (B) any sale, lease, transfer or assignment of any property or assets of the Company or any of its Subsidiaries, except in the Ordinary Course of Business; (C) any incurring, assuming or guaranteeing of any Indebtedness, or modification of the terms of any Indebtedness outstanding as of April 30, 2007; (D) any modification of, or waiver under any Material Contract which results in a material increase in the amount of payments due by the Company or a material reduction in the amount of payments due to the Company under such Material Contract, or the cancellation of any Contract that would be required to be listed as a Material Contract pursuant to Section 3.1(k) hereof if such Contract was in effect in the date hereof; or (E) any agreement, whether in writing or otherwise, to do any of the foregoing.

(h)    Absence of Litigation; Investigations. As of the date of this Agreement, there is no action, suit or proceeding, claim, arbitration, litigation or investigation by or before any Governmental Entity (each, an "Action") pending or, to the Knowledge of the Company, threatened in writing (A) against or specifically affecting the Company or any of its Subsidiaries or (B) that challenges or seeks to prevent, enjoin or otherwise delay the Merger. To the Knowledge of the Company, as of the date of this Agreement no event has occurred or circumstances exist that would reasonably be expected to give rise or serve as a valid basis for any material Action. As of the date of this Agreement, there is no Action pending or, to the Knowledge of the Company, threatened in writing against any current or, to the Knowledge of the Company, former director or employee of the Company or any of its Subsidiaries with respect to which the Company or any of its Subsidiaries has or is reasonably likely to have an indemnification obligation. As of the date of this Agreement, there is no unsatisfied judgment, penalty or award against or affecting the Company or any of its Subsidiaries or any of their respective properties or assets. As of the date of this Agreement, there is no Order to which the Company or any of its Subsidiaries or any of their respective properties or assets are subject. There has not been since January 1, 2000, and as of the date of this Agreement there are not, any

internal investigations or inquiries being conducted by the Company, its Board of Directors or, to the Knowledge of the Company, any third party or Governmental Entity at the request of any of the foregoing concerning any conflict of interest, self-dealing, fraudulent or deceptive conduct or other misfeasance or malfeasance issues.

(i)    Compliance with Applicable Laws. The Company and its Subsidiaries hold all permits, licenses, variances, exemptions, certificates, authorizations, Orders and approvals of all Governmental Entities that are necessary to the lawful operation of the respective business of the Company and its Subsidiaries, except where the failure to hold such Permits would not reasonably be expected to have a Material Adverse Effect on the Company (the "Permits"). All such Permits are in full force and effect and the Company and its Subsidiaries are in compliance with the terms of all such Permits, except where the failure so to maintain such Permits or so to comply would not reasonably be expected to have a Material Adverse Effect on the Company. The Company and its Subsidiaries are in compliance with all applicable Laws and Orders, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect on the Company. The Company has not received any notice between June 1, 2003 and the date of this Agreement to the effect that the Company or any of its Subsidiaries is not in compliance with the terms of such Permits or any such Laws or Orders, except any such notice that has been withdrawn or with respect to which the noncompliance described therein has been cured in all material respects.

(j)    Absence of Changes in Benefit Plans; Employment Matters.

(i)    Except as expressly permitted or required by this Agreement or to the extent necessary to comply with applicable law, since the Balance Sheet Date, there was no adoption or amendment by the Company or any entity, trade or business that is required, together with the Company, to be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA (a "Controlled Group Member") of:

(A)    any stock ownership, stock purchase, stock appreciation, stock option or phantom stock benefit plan, program or arrangement (whether oral or written) not governed by ERISA (together, "Equity Benefit Plans");

(B)    any pension, profit and retirement savings, cafeteria, severance, disability, death, medical, welfare or other benefit plan, program or arrangement (whether oral or written), that is an "employee benefit plan," as defined in Section 3(3) of Employee Retirement Income Security Act of 1974, as amended ("ERISA") (together, "ERISA Benefit Plans"); or

(C)    any deferred compensation, cash bonus, stock bonus, performance or other incentive compensation, retention, sale or stay bonus, severance, vacation, paid time off or paid sick time benefit plan, program or arrangement (whether oral or written) that is not governed by ERISA (together, "Non-ERISA Benefit Plans"),

providing any such benefits to any current or former employee, officer or director of the Company or any of its Subsidiaries. Except as set forth in Section 3.1(j)(i) of the Disclosure Schedule, (i) each of the employees of the Company and its Subsidiaries is employed at will, and

(ii) there exist no employment (except employment-at-will), consulting, deferred compensation, post-termination payment, retention, sale, bonus, stay bonus, or severance, change-in-control, termination or indemnification agreements or arrangements (whether oral or written) between the Company or any of its Subsidiaries, on the one hand, and any current or former director, officer, employee or consultant of the Company or any of its Subsidiaries, on the other hand that contain any continuing rights or obligations by any party thereto.

(ii)    Section 3.1(j)(ii)(a) of the Disclosure Schedule sets forth a list of all plans, programs, Contracts or arrangements to which the Company or any Subsidiary is a party, or to which either is subject, pursuant to which payments (or acceleration of benefits or vesting of Company Stock Options or lapse of repurchase rights) may be required upon, or may become payable directly or indirectly as a result of, the transactions contemplated by this Agreement or any other change of control of the Company or the termination of any Person's service or employment relationship with the Company or its Subsidiaries in connection therewith, other than employment Contracts entered into by the Company or any Subsidiary with employees based in Canada and/or the United Kingdom which provide for notice or severance in lieu of notice in accordance with the standard parameters set forth in Section 3.1(j)(ii)(b) of the Disclosure Schedule (the "UK/Canada Standard Employment Agreements"). Complete and accurate copies of the plans, programs, Contracts or arrangements listed in Section 3.1(j)(ii)(a) of the Disclosure Schedule, including all amendments thereto, have been delivered or Made Available to Parent, other than the UK/Canada Standard Employment Agreements.

(k)    Contracts.

(i)    Section 3.1(k)(i) of the Disclosure Schedule sets forth, as of the date of this Agreement, a list of, and the Company has delivered or Made Available to Parent true and correct copies of:

(A)    all Contracts of the Company, any of its Subsidiaries or any of its Affiliates for the purchase of materials, supplies, goods, services, equipment or other assets and that (i) involved payments by the Company or any of its subsidiaries during 2006 in excess of $200,000 or (ii) involves or would reasonably be expected to involve payments by the Company or any of its Subsidiaries during 2007 in excess of $100,000, other than Contracts that can be terminated by the Company at will within 60 days of the Closing Date without any Liability in excess of $10,000;

(B)    all Contracts for the sale by the Company or any of its Subsidiaries of its products and services pursuant to which the Company or any of its Subsidiaries recognized revenue of more than $100,000 in the year ended December 31, 2006 or expects to recognize revenue of more than $100,000 in the year ending December 31, 2007;

(C)    all Contracts that require the Company or any of its Subsidiaries to purchase its total requirements of any product or service from a third party or that contains "take or pay" provisions;

(D)    (i) any Contract which provides for a reseller or distributor to offer any Company products on a so-called "hosted basis" or (ii) any Contract which

constitutes one of the top eighteen (18) Contracts with resellers of the Company's "EAS" software application, based on the amount of revenue associated with such reseller in 2006 relative to all revenues associated with resellers of the Company's EAS software application in 2006 or (iii) any other Contracts with a third party granting such party the right to sublicense, resell or distribute the Company's "Introspect" or "Digital Safe" application and which involved payments to the Company during 2006 in excess of $100,000 or which are reasonably expected to involve payments to the Company during 2007 in excess of $100,000;

    (E) all Contracts which provide for the indemnification by the Company or any of its Subsidiaries of any Person, the undertaking by the Company or any of its Subsidiaries to be responsible for consequential damages, or the assumption by the Company or any of its Subsidiaries of any Tax, environmental or other liability, excluding Contracts with customers, resellers and suppliers of the Company entered into in the Ordinary Course of Business;

    (F) all Contracts of the Company, any of its Subsidiaries or any of its Affiliates for any remaining capital expenditure or remaining leasehold improvement in excess of $25,000;

    (G) all Contracts of the Company, any of its Subsidiaries or any of its Affiliates that relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise);

    (H) all Contracts of the Company, any of its Subsidiaries or any of its Affiliates that is a collective bargaining Contract or other Contract with any labor organization, union or association;

    (I) all Contracts of the Company, any of its Subsidiaries or any of its Affiliates that contain a covenant restricting the ability of the Company or any of its Subsidiaries (or which, following the consummation of the Merger, would reasonably be expected to restrict the ability of Parent or any of its Subsidiaries) to compete or engage in any significant business practice with respect to the development, manufacturing, marketing or distribution of any of the Company's current products or services in any material respect, including Contracts with "most favored customer" pricing provisions or granting any exclusive distribution rights, in any market, field or territory;

    (J) all Contracts (including employment, consulting, bonus, compensation, severance, or retention Contracts) of the Company or any of its Subsidiaries with any Affiliate of the Company (other than any of its Subsidiaries) other than offer letters, employment agreements or consulting agreements providing solely for at will employment or services and containing no right to any pay or benefits after employment or services have been terminated, other than the UK/Canada Standard Employment Agreements;

    (K) all Contracts of the Company or any of its Subsidiaries pursuant to which any third party is authorized to use, copy, market, distribute or in any other manner exploit any Intellectual Property of the Company or any of its Subsidiaries other than licenses granted to distributors, resellers and customers in the Ordinary Course of Business and

non-exclusive immaterial Contracts;

(L)    all Contracts of the Company or any of its Subsidiaries pursuant to which the Company or such Subsidiary is granted rights in Intellectual Property of any third Person that are embodied in or incorporated into any of the Company's products (excluding any licenses for software that is "shrink-wrap" software or similar commercially available end-user licenses);

(M)    all material joint venture, partnership or other similar Contracts to which the Company or any of its Subsidiaries is a party that result in the creation of a separate legal entity;

(N)    all Contracts of the Company or any of its Subsidiaries involving the lease of real property with an annual payment of greater than $10,000;

(O)    all loan agreements, credit agreements, letters of credit, notes, debentures, bonds, mortgages, indentures, promissory notes and other Contracts of the Company or any of its Subsidiaries relating to the borrowing of money or extension of credit other than standard invoice terms for payments of invoices in connection with sales of the Company's products or services (collectively, "Debt Obligations") pursuant to which any material indebtedness of the Company or any of its Subsidiaries is outstanding or may be incurred and all guarantees of or by the Company or any of its Subsidiaries of any Debt Obligations of any other Person; and

(P)    all powers of attorney and Contracts and arrangements of the Company or any of its Subsidiaries pursuant to which the Company or any Subsidiary of the Company has any material obligations or liabilities (whether absolute, accrued, contingent or otherwise), as guarantor, surety, co-signer, endorser, co-maker, or otherwise in respect of any obligation of any Person, or any material capital maintenance or similar agreements or arrangements.

(ii)    Each Contract (x) referenced in Sections 3.1(k)(i) through 3.1(k)(i)(P) above (notwithstanding any disclosures contained in Section 3.1(k)(i) of the Disclosure Schedule), and (y) that is a customer or supply Contract (excluding purchase orders given or received in the Ordinary Course of Business) under which the Company or any Subsidiary of the Company paid or received in excess of $250,000 for the fiscal year ended December 31, 2006 or, based on information as of the date of this Agreement, is reasonably expected to pay or receive in excess of $250,000 for the fiscal year ended December 31, 2007 (each Contract referenced in either (x) or (y) being referred to herein as a "Material Contract" and all collectively as the "Material Contracts"), is in full force and effect as of the date of this Agreement (except for those Contracts that have expired in accordance with their terms) and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms (subject to (A) applicable bankruptcy, insolvency, fraudulent transfer and conveyance, moratorium, reorganization, receivership and similar Laws relating to or affecting the enforcement of the rights and remedies of creditors generally and (B) principles of equity (regardless of whether considered and applied in a proceeding in equity or at law)), of the Company or the applicable Subsidiary, and the Company or the applicable Subsidiary has

performed all of its material obligations under, and is not in violation or breach of or default under, any such Contract or agreement except for such violation or breach which would not reasonably be expected to have a Material Adverse Effect on the Company. To the Knowledge of the Company, the other parties to any such Contract or agreement have performed all of their obligations under, and are not in violation or breach of or default under, any such Contract or agreement except for such violations or breaches which would not reasonably be expected to have a Material Adverse Effect on the Company.

(l)     Breach of Contract. The execution of this Agreement and the consummation of the transactions contemplated hereby will not cause a material breach in any of the Material Contracts and no approval or consent of any other party to any of the Material Contracts is required in order for those Material Contracts to continue in effect after the consummation of the Merger.

(m)     Intellectual Property.

(i)     Section 3.1(m) of the Disclosure Schedule lists all registered and material unregistered trademarks and applications therefor, registered trade names, registered service marks, registered copyrights and applications therefor, patents and patent applications, and the jurisdictions in which each of the foregoing was or is filed or registered, if owned by or licensed to the Company or any of its Subsidiaries and indicating whether owned by or licensed to the Company or any of its Subsidiaries. All patents, registered trademarks, registered trade names, registered service marks and registered copyrights held by the Company or any of its Subsidiaries are valid and subsisting. All necessary registration, maintenance and renewal fees in connection with the foregoing have been paid and all necessary documents and certificates in connection with the foregoing have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of perfecting, prosecuting and maintaining the foregoing. There are no actions that are required to be taken by Company within sixty (60) days of the date of this Agreement with respect to any of the foregoing.

(ii)     Each of the Company and its Subsidiaries owns the entire right, interest and title to, or is validly licensed or otherwise has the right to use, and solely with respect to that which is owned by the Company or its Subsidiaries free and clear of any Liens (other than Permitted Liens), all Intellectual Property used by or necessary for the Company to carry on its business as currently conducted. Such Intellectual Property constitutes all the Intellectual Property necessary to the conduct of the business of the Company and its Subsidiaries as currently conducted by the Company and its Subsidiaries, including the design, development, manufacture, use, import and sale of products and technology and the performance of services.

(iii)     None of the Company or any of its Subsidiaries has infringed or infringes upon as of the date of this Agreement, misappropriated or misappropriates as of the date of this Agreement any Intellectual Property or other proprietary information of any other Person. None of the Company or any of its Subsidiaries has received as of the date of this Agreement any written charge, complaint, claim, demand or notice alleging that the Company or any of its Subsidiaries has infringed or infringes as of the date of this Agreement, misappropriated or misappropriates as of the date of this Agreement, or by conducting its

business as currently conducted would infringe or misappropriate any Intellectual Property of any other Person nor, to the Knowledge of the Company, is there a reasonable basis for any such claim. As of the date of this Agreement, none of the Company or any of its Subsidiaries is party to or the subject of any pending or, to the Knowledge of the Company, threatened, suit, claim, action, or proceeding with respect to any such infringement or misappropriation. To the Knowledge of the Company, as of the date of this Agreement no other Person has infringed or infringes upon, or misappropriated or misappropriates any Intellectual Property owned by the Company or any of its Subsidiaries. As of the date of this Agreement, none of the Company or any of its Subsidiaries has received any opinion of counsel that a third party patent applies to any product produced, marketed, licensed, sold or distributed by the Company or any of its Subsidiaries. None of the Company or any of its Subsidiaries has brought any action, suit or proceeding for infringement of any Intellectual Property of the Company or any of its Subsidiaries, or for breach of any license or agreement involving any of such Intellectual Property, against any party that remains pending as of the date of this Agreement, and to the Knowledge of the Company as of the date of this Agreement, there is no unauthorized use, disclosure, infringement or misappropriation of any such Intellectual Property by any third party, including any employee or former employee of the Company or any of its Subsidiaries.

(iv)    The Company has taken commercially reasonable steps to protect and preserve the confidentiality of all Proprietary Information owned by the Company related to the business of the Company that is not covered by an issued patent. True and complete copies of the current form or forms of agreements containing binding written confidentiality and non-use provisions between the Company and third parties ("Nondisclosure Agreements") utilized by the Company have been provided to Parent. The Company is, and to Company's Knowledge, all other parties thereto are, in material compliance with the provisions of all Nondisclosure Agreements to which the Company is a party. The Company is in material compliance with the terms of all Contracts pursuant to which a third party has disclosed to, or authorized the Company to use, Proprietary Information related to the business owned by such third party.

(v)    Neither the Company nor any of its Subsidiaries has transferred title to, or granted any exclusive license with respect to, any material Intellectual Property that is used in the business of the Company or any Subsidiary as currently conducted.

(vi)    The Company has a policy of obtaining from each current and former employee or consultant who is or was involved in the creation or development of any Intellectual Property of the Company an agreement containing an irrevocable assignment to the Company of the Intellectual Property created or developed by such employee, and, to the Knowledge of the Company, there are no material breaches of such policy. Each of the Company and its Subsidiaries has taken all reasonable steps (based on standard industry practices) to protect its Intellectual Property and rights thereunder and, to the Knowledge of the Company, no such rights to Intellectual Property have been lost or are in jeopardy of being lost as a result of any act or omission by the Company or any of its Subsidiaries. The Company does not believe it is or will be necessary to use any inventions of any of its employees, consultants or independent contractors made prior to their employment by, or performance of services for, the Company and its Subsidiaries. No current or former employee or consultant or any other person has any ownership interest in or to any of the Intellectual Property owned or exclusively licensed by the Company. To the Company's Knowledge, no employee, consultant or contractor of the Company

development tools, development kits, bug fixes, error corrections and similar code licensed or otherwise provided in the Ordinary Course of Business, the source code of any of the Company's Software and the data associated therewith have not been licensed or otherwise provided by the Company or its Subsidiaries to another Person (other than escrow arrangements in the Ordinary Course of Business), and have been safeguarded and protected as Proprietary Information. There has not been any release of the source code of the Company's Software based on release conditions in such escrow arrangements.

(iv)    "Open Source Materials" means any software or other material that is made generally available to the public, under license (including but not limited to the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, and any other similar "free software" or "open source" licenses) without requiring the payment of any fees or royalties. Neither the Company nor any of its Subsidiaries have incorporated Open Source Materials into, or combined Open Source Materials with, the Software distributed or marketed by the Company or its Subsidiaries, which Open Source Materials require, as a condition of use, modification or distribution of such Open Source Materials that other software incorporated into, derived from or distributed with such Open Source Materials be (x) disclosed or distributed in source code form, (y) licensed for the purpose of making derivative works, or (z) redistributable at no charge.

(o)    Labor Matters.

(i)    Neither the Company nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement with any labor organization, group or association covering any of its employees and, to the Knowledge of the Company, there are no attempts to organize any of the Company's or any of its Subsidiaries' employees by any Person, unit or group seeking to act as their bargaining agent. The Company has complied with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal employment opportunity, occupational safety and health, collective bargaining, nondiscrimination, and the withholding and payment of social security and other Taxes, except for such failures to comply that would not reasonably be expected to have a Material Adverse Effect on the Company. There are no pending or, to the Knowledge of the Company, threatened material charges of unfair labor practices or of employment discrimination or of any other wrongful action with respect to any aspect of employment or service of any Person employed or formerly employed by the Company or any of its Subsidiaries. To the Knowledge of the Company, no union representation elections relating to the Company's employees have been scheduled by any Governmental Entity and no investigation of the employment policies or practices of the Company by any Governmental Entity is pending or threatened.

(ii)    Set forth in Section 3.1(o)(ii) of the Disclosure Schedule is a list indicating the number of employees employed by the Company and each Subsidiary as of the date of this Agreement in each jurisdiction in which the Company or its Subsidiaries operates. Subject to the effect of any applicable employment Laws regarding notice pay and periods, no Person is employed by the Company or its Subsidiaries other than at the will of the Company or its Subsidiaries for an indefinite period of time.

(p)    Employee Benefit Matters. Set forth in Section 3.1(p) of the Disclosure

Schedule is a list of (i) each currently outstanding loan to any employee, officer or director, (ii) each ERISA Benefit Plan, (iii) each Equity Benefit Plan and (iv) each Non-ERISA Benefit Plan, sponsored or maintained by the Company or any Controlled Group Member or to which the Company or any Controlled Group Member is required to make contributions (such plans, agreements, arrangements and related trusts and related agreements and arrangements being hereinafter referred to as the "Benefit Plans"). The Company has delivered or Made Available to Parent true and complete copies of all Benefit Plans, summary plan descriptions (if any), standard form agreements representing awards (including the standard form of stock option agreement) granted thereunder, and all annual reports and returns filed with the Internal Revenue Service or Department of Labor with respect to the three (3) most recent filings made for such Benefit Plans prior to the date of this Agreement. In addition:

(i)       each Benefit Plan has been operated and administered in compliance with its terms and all applicable Laws, including ERISA and the Code, in all material respects;

(ii)      each Benefit Plan complies in all material respects, as applicable, with requirements of ERISA and the Code, and all other applicable Laws;

(iii)     each Benefit Plan intended to qualify under Section 401(a) of the Code has received a favorable determination opinion, advisory or notification letter from the Internal Revenue Service as to its qualification under Section 401(a) of the Code or has time remaining to apply for the same under applicable Treasury Regulations or IRS pronouncements, and nothing has occurred that could adversely affect such qualified status;

(iv)      neither the Company nor any Controlled Group Member maintains, sponsors or contributes to, or has maintained, sponsored or contributed to, any "defined benefit plan" (within the meaning of Section 414(j) of the Code), any "multiemployer plan" (within the meaning of Section 3(37) of ERISA), or any "multiple employer plan" (within the meaning of Section 413 of the Code);

(v)       no material "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975(c) of the Code) has occurred with respect to any ERISA Benefit Plan;

(vi)      each Benefit Plan can be amended, discontinued or terminated at any time (including after the Effective Time) in accordance with its terms, without material liability (other than (A) liability for ordinary administrative expenses typically incurred in a termination event, or (B) liabilities for which sufficient assets are set aside in a trust or insurance contract to satisfy such liabilities or which are accrued on the Company Financial Statements);

(vii)     all contributions required to be made in connection with any Benefit Plan through the date of this Agreement have been timely made or, if not yet due, have been accrued on the Company Financial Statements;

(viii)    other than claims in the ordinary course for benefits with respect to the Benefit Plans, there are no Actions pending against the Company or any of its Subsidiaries with respect to any Benefit Plan, or, to the Knowledge of the Company as of the date of this

Agreement, any circumstances which would reasonably be expected to give rise to any valid Action;

(ix)    all reports, returns and similar documents with respect to the Benefit Plans required to be filed with any Governmental Entity have been timely filed;

(x)    neither the Company nor any Controlled Group Member has any obligation to provide health or other welfare benefits to former, retired or terminated employees, except as specifically required under Section 4980B of the Code or Part 6 of Subtitle B of Title I of ERISA, and the Company and the Controlled Group Members have complied in all material respects with the notice and continuation requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA and the regulations thereunder;

(xi)    no benefit under any Benefit Plan, including, without limitation, any severance or parachute payment plan or agreement, will be established or become accelerated, vested or payable by reason of any transaction contemplated under this Agreement either alone or in conjunction with another event (e.g., termination of employment). Neither the execution and delivery of this Agreement, nor the consummation of any transaction contemplated by this Agreement will trigger any funding (through a grantor trust or otherwise) of any compensation, severance or other benefits under any Benefit Plan. The Company has not made any payments, is obligated to make any payments or is a party to any agreement that under certain circumstances could (i) require the Company, any Subsidiary or Parent to make any payments that are not deductible under Section 280G of the Code, or (ii) result in an excise Tax to the recipient of such payments pursuant to Section 4999 of the Code;

(xii)    Section 3.1(p)(xiii) of the Disclosure Schedule sets forth a list of all Benefit Plans covering employees of the Company or any of its Subsidiaries and maintained by the Company or any of its Subsidiaries outside of the United States (the "Foreign Plans"). The Foreign Plans have been operated in accordance, and are in compliance, with their constituent documents and all applicable Laws in all material respects. There are no unfunded material liabilities under or in respect of the Foreign Plans, and all material contributions or other material payments required to be made to or in respect of the Foreign Plans prior to the Closing Date have been made or will be made prior to the Closing Date;

(xiii)    Section 3.1(p)(xiv) of the Disclosure Schedule sets forth a list of all plans, programs Contracts or arrangements to which the Company or any of its Subsidiaries is a party, or to which either is subject, which the Company believes in good faith provide for the payment of deferred compensation subject to Section 409A of the Code;

(xiv)    each Benefit Plan that is a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has been operated and administered in good faith compliance with Section 409A of the Code during the period beginning January 1, 2005 through the date hereof and has not been materially modified since October 2, 2004. With respect to stock options granted after December 31, 2004, the Company's Board of Directors or its duly constituted committee set the exercise price at or above the dollar amount which it determined in good faith to be the fair market value of the underlying shares on the date of grant based on the reasonable application of a reasonable valuation method. With respect to stock

options granted before January 1, 2005, the Company's Board of Directors or its duly constituted committee made a good faith attempt to set the exercise price at or above the fair market value of the underlying shares on the date of grant. The Company believes in good faith that any amounts paid or payable pursuant to each Benefit Plan subject to Section 409A of the Code is not includible in the gross income of a service provider (within the meaning of Section 409A) until received by the service provider and is not subject to interest or the additional tax imposed by Section 409A of the Code, and there are no agreements in place that would entitle a participant in any such plan to reimbursement for any such additional tax; and

(xv)    Each individual that renders services to the Company who is classified by the Company as (i) an independent contractor or other non employee status, or (ii) an exempt or non-exempt employee, is properly so classified for all purposes, including (w) taxation and Tax reporting, (x) eligibility to participate in the Benefit Plans, (y) Fair Labor Standards Act purposes, and (z) applicable Law governing the payment of wages.

(q)    Taxes.

(i)    Each of the Company and its Subsidiaries has filed or caused to be filed on a timely basis all federal, state, local, foreign and other Tax returns, reports and declarations (collectively, "Tax Returns") required to be filed by it and has paid all federal, state, local, foreign and other taxes, including income, gross receipts, capital stock, profits, stamp, occupation, transfer, value added, excise, franchise, sales, use, property (whether real, personal or mixed), employment, unemployment, disability, withholding, social security and workers' compensation taxes and estimated income and franchise tax payments, and interest, penalties, fines, costs and assessments (each, a "Tax" and collectively, "Taxes") through the last periods covered by such Tax Returns (whether or not shown as due on any Tax Returns). All Tax Returns filed by or on behalf of the Company and its Subsidiaries are complete and accurate and have been prepared in compliance with all applicable Laws, except for such failures to comply that would not reasonably be expected to have a Material Adverse Effect on the Company. There are no Tax Liens on any of the properties or assets, real, personal or mixed, tangible or intangible, of the Company or any of its Subsidiaries, other than for Taxes not yet due and payable.

(ii)    No material deficiency in Taxes of the Company or any of its Subsidiaries for any period has been asserted by any Governmental Entity which remains unpaid at the date of this Agreement and as of the Closing Date. Since December 31, 2000, no material Tax Returns of the Company or any of its Subsidiaries have ever been audited. As of the date of this Agreement and as of the Closing Date, no inquiries or notices have been received by the Company or any of its Subsidiaries from a Government Entity with respect to possible claims for Taxes in any material amount that have not been resolved (and paid, if applicable) prior to the date of this Agreement, and the Company has no Knowledge that any such inquiry or notice is pending or threatened, and to the Knowledge of the Company, as of the date of this Agreement there is no basis for any additional claims or assessments for a material amount of Taxes. Neither the Company nor any of its Subsidiaries has agreed to the extension of the statute of limitations with respect to any Tax Returns or Tax periods. There are no assessments relating to the Company's or any of its Subsidiaries' Tax Returns including Taxes in any material amount pending or, to the Knowledge of the Company, threatened in writing. The Company has

delivered or Made Available to Parent true and complete copies of all material income (or franchise) Tax Returns filed by it and any of its Subsidiaries for the fiscal years 2004 through 2006. Neither the Company nor any of its Subsidiaries is, or has been, the common parent or a member of any affiliated group of corporations filing a consolidated or combined income or franchise Tax Return (other than a group the common parent of which was the Company) and is not a party to any Tax sharing agreement or other arrangement pursuant to which it could be liable for the Taxes of any third party in any material amount.

(iii)    Adequate accruals and reserves have been made in the Company Financial Statements and the books and records of the Company and its Subsidiaries for the payment of all unpaid Taxes of the Company and its Subsidiaries for all periods through the respective dates thereof in accordance with GAAP.

(iv)    The Company has not been liable for the payment of interest, penalties, or fines in relation to Taxes in a material amount during the past five years.

(v)    Neither the Company nor any of its Subsidiaries has filed a consent under Section 341(f) of the Code concerning collapsible corporations. Neither the Company nor any of its Subsidiaries is a party to any Contract, arrangement or plan with any employee or independent contractor that has resulted or would result, separately or in the aggregate, in the payment of any amount that will not be fully deductible as a result of Section 162(m) of the Code (or any corresponding provision of Tax Law). Neither the Company nor any Subsidiary of the Company has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code. The Company and its Subsidiaries have disclosed on their Federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of a material Federal income Tax liability within the meaning of Section 6662 of the Code.

(vi)    The Company and each of its Subsidiaries have withheld and timely paid all material Taxes required to have been withheld and paid to the appropriate taxing authorities in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party and has materially complied with all information reporting and backup withholding requirements, including maintenance of required records with respect thereto in connection with any amounts paid to any employee, independent contractor, creditor, shareholder or other third party.

(vii)    Neither the Company nor any of its Subsidiaries will be required to include in a taxable period after the Closing Date taxable income that accrued (for financial accounting purposes) in a prior taxable period (or portion of a taxable period) but was not recognized for tax purposes in any prior taxable period as a result of (A) an open transaction disposition made on or before the Closing Date, (B) a prepaid amount received on or prior to the Closing Date, (C) the installment method of accounting, (D) the completed contract method of accounting, (E) the long-term contract method of accounting, (F) the cash method of accounting or Section 481 of the Code, (G) an intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code, (H) any "closing agreement" as described in Section 7121 of the Code or (I) any comparable provisions of state or local tax law, domestic or foreign, or for any other reason.

(r)    Environmental Matters.

(i)    Each of the Company and its Subsidiaries possesses all material Environmental Permits necessary to conduct its businesses and operations as being conducted as of the date of this Agreement, and all such Environmental Permits are in full force and effect. None of the Company or its Subsidiaries has been notified by any Governmental Entity prior to the date of this Agreement that any Environmental Permits will be modified, suspended or revoked.

(ii)    Each of the Company and its Subsidiaries is in compliance in all material respects with all applicable Environmental Laws and the terms and conditions of all Environmental Permits. None of the Company or its Subsidiaries has received any communication from any Governmental Entity or other Person that alleges that the Company or any of its Subsidiaries has violated or is, or may be, liable under any Environmental Law.

(iii)    There are no pending or, to the Knowledge of the Company, past or threatened material Environmental Claims (A) against the Company or any of its Subsidiaries or (B) against any Person whose liability for any Environmental Claim the Company or any of its Subsidiaries has retained or assumed, either by Contract or by operation of Law.

(iv)    To the Knowledge of the Company, there have been no Releases of any Hazardous Materials at, from, in, to, on or under any real properties currently or previously owned, leased, or utilized by the Company or any of its Subsidiaries or predecessors that would reasonably be expected to form the bases of any material Environmental Claim against the Company or any of its Subsidiaries.

(v)    To the Knowledge of the Company, neither the Company nor any of its Subsidiaries or predecessors transported or arranged for the transportation, treatment, storage, handling or disposal of any Hazardous Materials to any off-site location that could reasonably be anticipated to result in a material Environmental Claim against the Company or any of its Subsidiaries.

(vi)    To the Knowledge of the Company, there are no (A) underground storage tanks, active or abandoned, (B) polychlorinated-biphenyl-containing equipment or (C) asbestos-containing material, within the leasehold of any site or building utilized by the Company or any of its Subsidiaries.

(vii)    There have been no environmental investigations, studies, tests, audits, reviews or other analyses conducted by or on behalf of, or that are in the possession of, the Company or any of its Subsidiaries which have not been delivered or Made Available to Parent.

(viii)    For purposes of this Agreement, the following defined terms shall apply:

(A)    "Environmental Claims" means any and all actions, Orders, decrees, suits, demands, directives, claims, Liens, investigations, proceedings or notices of violation by any Governmental Entity or other Person alleging potential responsibility or liability

arising out of, based on or related to (1) the presence, Release or threatened Release of, or exposure to, any Hazardous Materials at any location or (2) circumstances forming the basis of any violation or alleged violation of any Environmental Law;

(B)    "Environmental Laws" means all Laws, Orders, decrees, common law, judgments or binding agreements issued, promulgated or entered into by or with any Governmental Entity with applicable authority over such matters relating to pollution or protection of the environment or human health;

(C)    "Environmental Permits" means all permits, licenses, registrations and other authorizations required under applicable Environmental Laws;

(D)    "Hazardous Materials" means all hazardous, toxic, explosive or radioactive substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos, polychlorinated biphenyls, radon gas and all other substances or wastes of any nature regulated pursuant to any Environmental Law; and

(E)    "Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment or within any building, structure, facility or fixture.

(s)    Assets in Good Condition. All physical assets of the Company and its Subsidiaries carried for value on the Financial Statements are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted.

(t)    Insurance.

(i)    Section 3.1(t)(i) of the Disclosure Schedule sets forth as of the date of this Agreement (A) a list of all insurance policies, binders of insurance and fidelity bonds that cover the Company or any of its Subsidiaries or their respective businesses, properties, assets, directors or employees (the "Policies") and (B) a list of all pending material claims and the claims history of material claims for the Company and each Subsidiary during the current year and the preceding three years (including with respect to insurance obtained but not maintained as of the date of this Agreement). There are no pending material claims under any of such Policies as to which to the Knowledge of the Company as of the date of this Agreement, coverage has been questioned, denied or disputed by the insurer or in respect of which the insurer has reserved its rights.

(ii)    Section 3.1(t)(ii) of the Disclosure Schedule describes any self-insurance arrangement by or affecting the Company or any of its Subsidiaries, including any reserves thereunder, and describes the loss experience for all material claims that were self-insured in the current year and the preceding three years.

(iii)    As of the date of this Agreement, all material Policies are in full force and effect and are enforceable in accordance with their terms, and the consummation of the Merger will not, pursuant to the terms of such material Policy, give any party thereto a right to terminate such Policy.

(iv)    All premiums due under the Policies have been paid in full or, with respect to premiums not yet due, accrued. Neither the Company nor any of its Subsidiaries has received prior to the date of this Agreement a notice of cancellation of any current Policy or of any material changes that are required in the conduct of the business of the Company or any of its Subsidiaries as a condition to the continuation of coverage under, or renewal of, any such current Policy. To the Knowledge of the Company, there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default under any material Policy or entitle any insurer to terminate or cancel any material Policy. To the Knowledge of the Company, as of the date of this Agreement, there is no threatened termination of, or material premium increase with respect to, any material Policy and none of such Policies provides for retroactive material premium adjustments.

(u)    <u>Title to Properties</u>.

(i)    Each of the Company and its Subsidiaries has marketable and legal title to, or valid leasehold interests in, all of its properties and assets except for such as are no longer used in the conduct of its respective businesses and except for defects in title, easements, restrictive covenants and similar Liens and encumbrances that would not reasonably be expected to have a Material Adverse Effect on the Company. All such properties and assets, other than properties and assets in which the Company or any of its Subsidiaries has a leasehold interest, are free and clear of all Liens, other than Permitted Liens.

(ii)    Each of the Company and its Subsidiaries has complied with the terms of all leases to which it is a party and under which it is in occupancy, and all such leases are in full force and effect, except for such noncompliances or failures to be in full force and effect that would not reasonably be expected to have a Material Adverse Effect on the Company. The Company and its Subsidiaries enjoy peaceful and undisturbed possession under all such leases. Neither of the Company nor any of its Subsidiaries owns or has ever owned in fee any real property or interests in real property.

(v)    <u>Related Party Transactions</u>. There are no Contracts of any kind, written or oral, entered into by the Company or any of its Subsidiaries with, or for the benefit of, any officer, director or shareholder of the Company or, to the Knowledge of the Company, any Affiliate of any of them, except in each case, for (a) employment agreements, fringe benefits and other compensation paid to directors, officers and employees consistent with previously established policies (including normal merit increases in such compensation in the Ordinary Course of Business) and copies of which have been provided to Parent and are listed on the Disclosure Schedule, excluding only UK/Canada Standard Employment Agreements and stock option agreements (provided that the forms therefor shall have been Made Available to Parent) (b) reimbursements of ordinary and necessary expenses incurred in connection with their employment or service, and (c) amounts paid pursuant to Company Benefit Plans of which copies have been provided to Parent. To the Knowledge of the Company, none of such Persons has any material direct or indirect ownership interest in any firm or corporation with which the Company or any of its Subsidiaries has a business relationship, or with any firm or corporation that competes with the Company or any of its Subsidiaries (other than ownership of securities in a publicly traded company representing less than one percent of the outstanding stock of such company). No officer or director of the Company or any of its Subsidiaries or member of his or

her immediate family or greater than 5% shareholder of the Company or, to the Knowledge of the Company, any Affiliate of any of them or any employee of the Company or any of its Subsidiaries is directly or indirectly interested in any Material Contract.

(w)    No Restrictions on Business. As of the date of this Agreement, there is no Order that has been entered against or is binding by its terms upon the Company or any of its Subsidiaries which has or would reasonably be expected to have the effect of prohibiting or impairing any significant business practice of the Company or any of its Subsidiaries or the conduct of business by the Company or any of its Subsidiaries as currently conducted.

(x)    Opinion of Financial Advisor. The financial advisor to the Company, Duff & Phelps, LLC, has delivered to the Company an opinion to the effect that as of the date of such opinion, and subject to the assumptions, qualifications and limitations set forth therein, the Merger Consideration is fair, from a financial point of view, to the Company Shareholders. The Company has provided a copy of such opinion to Parent for informational purposes only.

(y)    Brokers; Schedule of Fees.

(i)    No broker, investment banker, finder or financial advisor or other Person has been retained by, or is authorized to act on behalf of, the Company or any of its Subsidiaries, and is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement (other than Duff & Phelps, LLC, whose brokerage, investment banking, finders and financial advisory fees shall be paid by the Company and shall reduce the Merger Consideration as contemplated by Section 2.1 (the "Company Broker Fee")). The Company has heretofore delivered or Made Available to Parent a complete and correct copy of all agreements between the Company and Duff & Phelps, LLC pursuant to which such firm could be entitled to any payment relating to the transactions contemplated hereby.

(ii)    Section 3.1(y)(ii) of the Disclosure Schedule sets forth the Company's good faith estimate, as of the date of this Agreement, of the estimated fees and expenses incurred and to be incurred by the Company and its Subsidiaries in connection with the negotiation, execution and delivery of this Agreement and the other agreements and documents (including the Information Statement) contemplated hereby, and the performance of its obligations hereby and thereby (including the fees and expenses of Duff & Phelps, LLC and of the Company's legal counsel and accountants) (assuming for the purposes of making such estimates that Parent and the Company receive early termination of the waiting period applicable to the Merger under the HSR Act or any applicable foreign antitrust laws).

(z)    Suppliers and Customers. Between the Balance Sheet Date and the date of this Agreement, other than with regard to expiration of Contracts according to their terms or completion of performance of work, services, or other obligations according to the terms of any Contract, no material supplier or customer has canceled or otherwise terminated its relationship with the Company or any of its Subsidiaries. Between the Balance Sheet Date and the date of this Agreement, neither the Company nor any of its Subsidiaries has received written notice that any such supplier or customer intends to cancel or terminate its relationship with the Company or any of its Subsidiaries, and no such supplier or customer will be entitled to any material refund as a

result of the consummation of the transactions contemplated by this Agreement.

(aa)    <u>Corporate Records and Designations</u>.

(i)    Section 3.1(aa)(i) of the Disclosure Schedule sets forth as of the date of this Agreement (i) a list of all banks or financial institutions with which the Company or its Subsidiaries have an account, deposit, certificate of deposit or safe-deposit box along with identifying numbers and the names of all Persons authorized to draw thereon or have access thereto; (ii) the names of all incumbent directors and officers of the Company and its Subsidiaries and of all incumbent trustees and committee members under any of the employee Benefit Plans or related trusts; (iii) the names of all Persons having powers of attorney from the Company or its Subsidiaries and a statement of the terms thereof; and (iv) a description and identification of any insurance policies held or paid for by the Company or its Subsidiaries on the lives of any of its key management, officers or directors.

(ii)    The books, records and accounts of the Company and its Subsidiaries accurately and fairly reflect in all material respects, in reasonable detail, the transactions and the assets and liabilities of the Company and its Subsidiaries. The minute books (containing the records of the meetings, or written consents in lieu of such meetings, of the shareholders, the board of directors and any committees of the board of directors), the stock certificate books, and the stock record books of the Company and its Subsidiaries are correct and complete in all material respects, and have been maintained in accordance with sound business practices. There are no resolutions adopted or other actions taken by the Company Shareholders, the Company's Board of Directors or any committee of the Company's Board of Directors other than as disclosed in the records of the meetings and written consents contained in the minute books. At the Closing, all of those books and records will be in the possession of the Company or its legal counsel.

(bb)    <u>Immigration Matters</u>. The Company and its Subsidiaries have complied in all material respects with all relevant provisions of Section 274(A) of the Immigration and Nationality Act, as amended (the "<u>Immigration Act</u>"). Without limiting the foregoing, (a) each "employee" (as that term is defined in the Immigration Act) of the Company or its Subsidiaries is permitted to be so employed in the United States under the Immigration Act; (b) the Company and its Subsidiaries have examined (and made copies of, if applicable) the documents presented by such employee to establish appropriate employment eligibility under the Immigration Act; (c) the Company and its Subsidiaries have completed and required each employee hired on or since November 11, 1986 to complete a Form I-9 verifying employment eligibility under the Immigration Act; (d) the Company and its Subsidiaries have retained each such completed Form I-9 for the length of time required under the Immigration Act; and (e) no monetary penalties have been assessed against the Company or its Subsidiaries for violation of Section 274(A) of the Immigration Act.

(cc)    <u>Solvency</u>. Neither the Company nor any of its Subsidiaries is unable to pay its debts as they become due, has suspended making payments on any of its debts by reason of actual or anticipated financial difficulties or, by reason of actual or anticipated financial difficulties, commenced negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness. The value of the assets of the Company and its

Subsidiaries, taken as a whole, is not less than the liabilities of the Company and its Subsidiaries, taken as a whole (taking into account contingent and prospective liabilities). No Action, Order or Law is currently in effect or binding upon the Company or any of its Subsidiaries requiring or permitting the Company or any of its Subsidiaries to postpone or not fulfill its obligations with respect to indebtedness.

(dd)    Information Statement. In connection with obtaining the Company Shareholder Approval, the Company has given each Company Shareholder whose consent to the Merger was solicited prior to the date of this Agreement a disclosure and information statement describing the principal terms of this Agreement and the Merger and otherwise conforming, in all material respects, to applicable Law and has also delivered such disclosure and information statement, for informational purposes only, to the holders of Common Exchangeable Stock and Preferred Exchangeable Stock. Such disclosure and information statement did not, and any subsequent disclosure made to other Company Shareholders will not, contain any untrue statement of a material fact and did and will not omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

3.2    Representations and Warranties of Parent and Merger Sub. Parent and Merger Sub represent and warrant to the Company as follows:

(a)    Organization, Standing and Corporate Power. Each of Parent and Merger Sub is a corporation duly organized and validly existing under the Laws of the jurisdiction of its incorporation, has all requisite power to own, lease and operate its properties and to carry on its business as now being conducted. Each of Parent and Merger Sub is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which it owns or leases property or conducts any business so as to require such qualification, except for those jurisdictions where (i) the concept of qualification to do business or good standing is not recognized, and (ii) the failure to be so qualified and in good standing would not reasonably be expected to have a Material Adverse Effect on Parent.

(b)    Authority; Noncontravention.

(i)    The Board of Directors of Parent, at a meeting duly called and held, or by means of an action by unanimous written consent, duly resolved (A) to approve this Agreement, the Merger, the Underwriting Agreement and the other transactions contemplated hereby and thereby, (B) that it is in the best interests of Parent and its shareholders that Parent and Merger Sub enter into this Agreement, and that Parent enter into the Underwriting Agreement, and that Parent and Merger Sub consummate the Merger on the terms and subject to the conditions set forth herein and therein. No vote of Parent's shareholders is required by Law, the memorandum and articles of association of Parent or otherwise in order for Parent to approve this Agreement or the Underwriting Agreement or to consummate the transactions contemplated hereby or thereby.

(ii)    Parent and Merger Sub have the requisite corporate power and authority to execute and deliver this Agreement (and, with respect to Parent, the Underwriting Agreement) and to consummate the transactions contemplated by this Agreement (and, with

respect to Parent, by the Underwriting Agreement). Assuming the accuracy of the representations and warranties of the Company set forth in Section 3.1(d)(i), the execution and delivery of (x) this Agreement by Parent and Merger Sub, and (y) the Underwriting Agreement by Parent, and the consummation by Parent and Merger Sub of the transactions contemplated by this Agreement (and, with respect to Parent, by the Underwriting Agreement) have been duly authorized by all necessary corporate action on the part of Parent and Merger Sub (except for the approval by the sole shareholder of Merger Sub, which approval Parent shall cause to be obtained immediately following the execution and delivery of this Agreement) and no other board, shareholder or stockholder approvals on the part of Parent or Merger Sub are necessary to approve this Agreement or to consummate the transactions contemplated by this Agreement or the Underwriting Agreement. This Agreement has been duly executed and delivered by Parent and Merger Sub, and the Underwriting Agreement has been duly executed and delivered by Parent, and each constitutes a legal, valid and binding obligation of Parent and Merger Sub, as applicable, enforceable against Parent and Merger Sub, as applicable, in accordance with its terms subject to (A) applicable bankruptcy, insolvency, fraudulent transfer and conveyance, moratorium, reorganization, receivership and similar Laws relating to or affecting the enforcement of the rights and remedies of creditors generally and (B) principles of equity (regardless of whether considered and applied in a proceeding in equity or at law).

(iii)    The execution and delivery of (x) this Agreement by Parent and Merger Sub, and (y) the Underwriting Agreement by Parent, and the consummation of the transactions contemplated by this Agreement (and, with respect to Parent, the Underwriting Agreement) and compliance by Parent and Merger Sub with the provisions of this Agreement (and, with respect to Parent, of the Underwriting Agreement), do not and will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in termination, cancellation or acceleration of any obligation, or give rise to a loss of a material benefit under, or result in the creation of any Lien (other than Permitted Liens) in or upon any of the properties or assets of Parent or Merger Sub under any provision of (A) the Memorandum and Articles of Association of Parent or the Certificate of Incorporation or Bylaws of Merger Sub, (B) any Contract to which Parent or Merger Sub is a party or any of their respective properties or assets is subject or (C) subject to the governmental filings and other matters referred to in the following paragraph, any Law or Order, in each case, applicable to Parent or Merger Sub or their respective properties or assets; other than, in the case of clauses (B) and (C), any such conflicts, violations, breaches, defaults, rights, results, losses, or Liens that would not reasonably be expected to prevent or materially impede or delay the consummation of the Merger or the other transactions contemplated by this Agreement or the Underwriting Agreement.

(iv)    No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Entity is required by or with respect to Parent or Merger Sub in connection with the execution and delivery of (x) this Agreement by Parent and Merger Sub, and (y) the Underwriting Agreement by Parent, or the consummation by Parent and Merger Sub of the transactions contemplated by this Agreement (and, with respect to Parent, by the Underwriting Agreement) or the compliance with the provisions of this Agreement (and, with respect to Parent, of the Underwriting Agreement), except for (A) the filing of a premerger notification and report form by Parent and Merger Sub under the HSR Act or applicable foreign antitrust laws and the expiration or early termination of applicable waiting

periods under the HSR Act or applicable foreign antitrust laws, (B) the filing of the Agreement of Merger with the California Secretary of State and appropriate documents with the relevant authorities of other states in which the Company is qualified to do business, (C) approval of the UK Listing Authority ("UKLA") for the listing of the additional Parent Ordinary Shares to be issued pursuant to the Underwriting Agreement (the "New Parent Shares") and the admission of the New Parent Shares to the Official List of the UKLA; (D) approval by the London Stock Exchange plc ("LSE") for the admission to trading of the New Parent Shares on LSE's market for listed securities, and (E) such other consents, approvals, Orders, authorizations, registrations, declarations, filings or notices the failure of which to be obtained or made would not reasonably be expected to prevent or materially impede or delay the consummation of the Merger or the other transactions contemplated by this Agreement or the Underwriting Agreement.

(c)    Litigation. As of the date of this Agreement, there is no suit, claim, action, investigation or proceeding pending or, to the Knowledge of Parent or Merger Sub, overtly threatened against or affecting Parent or Merger Sub or any of their respective assets or properties before or by any Governmental Entity that, individually or in the aggregate, would reasonably be expected to prevent or materially impede or delay the consummation of the Merger and the other transactions contemplated by this Agreement, nor is there any Order of any Governmental Entity or arbitrator outstanding against Parent or Merger Sub that, individually or in the aggregate, would reasonably be expected to prevent or materially impede or delay the consummation of the Merger and the other transactions contemplated by this Agreement.

(d)    Interim Operations of Merger Sub. Merger Sub was formed solely for the purpose of engaging in the transactions contemplated hereby, has not engaged in any other business activities other than in connection with the transactions contemplated by this Agreement and the Underwriting Agreement.

(e)    Brokers. No broker, investment banker, finder or financial advisor or other Person has been retained by, or is authorized to act on behalf of, Parent or any of its Subsidiaries, and is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement (other than Deutsche Bank Securities, whose brokerage, investment banking, finders and financial advisory fees shall be paid by Parent).

(f)    Underwriting Agreement. Parent has provided to the Company a true and correct copy of the Underwriting Agreement as of the date of this Agreement. As of the date of this Agreement, there is no breach or default on the part of any party to the Underwriting Agreement, and as of the date of this Agreement, Parent has no Knowledge that the financing contemplated by the Underwriting Agreement will not be completed within five Business Days following the date of this Agreement. To Parent's Knowledge, as of the date of this Agreement no fact, event or circumstance has occurred or otherwise exists that would reasonably be expected to entitle any of the parties to the Underwriting Agreement to terminate the Underwriting Agreement or preclude or materially impede the performance by Parent of any of its covenants or agreements in the Underwriting Agreement or the satisfaction by Parent of any the conditions set forth in the Underwriting Agreement in any material respect.

ARTICLE IV

COVENANTS RELATING TO CONDUCT OF BUSINESS

4.1    Conduct of Business. Except (i) to the extent Parent shall otherwise consent in writing (which consent shall not be unreasonably withheld with respect to the matters described in clauses (j), (k), (l), (n), (o), (p), (q) and (r) of this Section 4.1), (ii) as set forth in Section 4.1 of the Disclosure Schedule, (iii) as expressly permitted or required by this Agreement, or (iv) as may be required to comply with applicable Law or any Contract of the Company or any of its Subsidiaries that has been disclosed in the Disclosure Schedule, between the date of this Agreement and the earlier of the termination of this Agreement or the Effective Time (the "Pre-Closing Period"), (A) the Company shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to (x) operate their respective businesses in the Ordinary Course of Business, (y) comply with applicable Laws in all material respects, and (z) preserve intact the assets, properties, Contracts and licenses of their current business organization, keep available the services of their current officers and employees and preserve their relationships with customers, suppliers, distributors, lessors, licensors, licensees, creditors, employees, contractors and others having business dealings with them, and (B) the Company shall not, and shall not permit any of its Subsidiaries to:

(a)    declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property) in respect of, any of its capital stock, other than the accrual of dividends required by the Company's Articles of Incorporation;

(b)    purchase, redeem or otherwise acquire any shares of capital stock or any other securities of the Company or its Subsidiaries or any options, warrants, calls or rights to acquire any such shares or other securities, or take any action to accelerate any vesting provisions of any such shares or securities, other than (i) the acceleration of Company Stock Options in accordance with their terms, (ii) shares repurchased from employees or former employees of the Company or any of its Subsidiaries pursuant to elections made by employees or former employees to sell or otherwise transfer shares of Company Common Stock to the Company to satisfy withholding obligations, and (iii) unvested shares repurchased by the Company, at a price per share not greater than the purchase price originally paid for those shares, from employees or service providers of the Company or any of its Subsidiaries in connection with the termination of their employment with or service to the Company or its Subsidiaries;

(c)    split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of, or in substitution for shares of its capital stock or any of its other securities;

(d)    (i) issue, deliver, sell, pledge or otherwise encumber any shares of its capital stock, any other equity or voting interests or any securities convertible into, or exchangeable for, or any options, warrants, calls or similar rights to acquire, any such shares, voting securities or convertible or exchangeable securities or any stock appreciation rights or similar rights that are linked in any way to the price of Company Common Stock or in any way alter the capitalization structure of the Company existing on the date of this Agreement, or (ii) issue any unvested shares of Company Common Stock or other securities subject to repurchase