by the Company or other forfeiture provision unless permitted by the terms of the applicable agreement for such Company Stock Option in effect on the date of this Agreement, other than, in the case of (i) and (ii), (A) the issuance of Company Stock Options under the Company Stock Option Plan in the Ordinary Course of Business to purchase up to an aggregate of 450,000 additional shares of Company Common Stock during the Pre-Closing Period and the issuance of shares of Company Common Stock pursuant to the exercise of those Company Stock Options, provided that such Company Stock Options are granted with an exercise price per share not less than the fair market value per share of Company Common Stock on the grant date, become exercisable and vest on a schedule of 25% on the first anniversary of the grant date and the remainder on a monthly basis over the following 36 months and do not provide for any accelerated vesting in connection with the transactions contemplated by this Agreement, (B) the issuance of shares of Company Common Stock upon the exercise of outstanding Company Stock Options pursuant to their terms, (C) as a result of the transactions contemplated hereby including any shares issued in connection with the Exchangeable Share Conversion, or (D) the exercise of Other Purchase Rights, in each case in accordance with their respective terms;

(e)     amend or propose to amend the Charter Documents of the Company or any of its Subsidiaries;

(f)     directly or indirectly acquire or agree to acquire, or obtain any direct or indirect interest in, all or substantially all of the assets constituting a business or any Person or division thereof, whether by merger, consolidation, purchasing of assets or capital stock, or pursuant to any other form of transaction;

(g)     adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of its Subsidiaries or otherwise permit the corporate existence of the Company or any of its Subsidiaries to be suspended, lapsed or revoked;

(h)     directly or indirectly sell, lease, license, sell and leaseback, mortgage or otherwise encumber or subject to any Lien (other than Permitted Liens) or otherwise dispose of any of its properties or assets or any interest therein, except in the Ordinary Course of Business;

(i)     (i) repurchase, prepay or incur any indebtedness or assume, guarantee or endorse any indebtedness of another Person, or issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of the Company or any of its Subsidiaries, except for borrowings in the Ordinary Course of Business or transactions between the Company and Parent or between the Company and any of its wholly-owned Subsidiaries, or (ii) make any loans, advances or capital contributions to, or investments in, any other Person, other than the Company or any direct or indirect wholly-owned Subsidiary of the Company;

(j)     make any capital expenditures that, when added to all other capital expenditures made on behalf of the Company and its Subsidiaries during the Pre-Closing Period exceed the total amount budgeted for capital expenditures by the Company during the Pre-Closing Period through the date of the proposed capital expenditure as set forth in the capital expense budget Made Available to Parent;

(k)    pay, discharge, settle or satisfy any material claims (including claims of shareholders), liabilities or obligations (whether absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction in the Ordinary Course of Business as required by applicable Law, Order or decision or as required by their terms as in effect on the date of this Agreement of claims, liabilities or obligations reflected or reserved against in the Financial Statements (for amounts not in excess of such reserves) or incurred since the date of such Financial Statements in the Ordinary Course of Business, or waive, release, grant or transfer any right of material value, other than in the Ordinary Course of Business;

(l)    enter into, modify, amend or terminate or waive, release or assign any rights under, (i) any Contract which if so entered into, modified, amended or terminated or waived, released or assigned could be reasonably likely to (x) have a Material Adverse Effect on the Company, (y) impair in any material respect the ability of the Company to perform its obligations under this Agreement or (z) prevent or materially delay the consummation of the transactions contemplated by this Agreement or (ii) except in the Ordinary Course of Business, any material Contract to which the Company or any Subsidiary thereof is a party;

(m)    (i) except as otherwise required to comply with any Benefit Plans existing on the date of this Agreement that have been disclosed in Section 3.1(j) of the Disclosure Schedule required thereunder, (A) modify the compensation or benefits payable or to become payable by the Company or any of its Subsidiaries to any of its current or former directors, employees, contractors or consultants, or (B) modify or enter into any bonus, severance, termination, pension, insurance or other employee benefit plan, payment or arrangement made to, for or with any current or former directors, employees, contractors or consultants of the Company or any of its Subsidiaries or (ii) enter into any employment (other than offer letters and letter agreements entered into in the Ordinary Course of Business with employees who are terminable "at-will"), severance or termination agreement; provided, however, that the Company may make its regular and scheduled increases to compensation, bonus and benefit plans with current employees and employees hired in accordance with this Section 4.1, in the Ordinary Course of Business on substantially the same schedule as previously implemented by the Company, but in any event not to exceed 5%;

(n)    hire any additional employees or retain any additional consultants other than in the Ordinary Course of Business;

(o)    maintain insurance in a manner or coverage amount materially inconsistent with past practice;

(p)    except as required by GAAP, revalue any of its material assets or make any changes in accounting methods, principles or practices;

(q)    make or revoke or otherwise modify any material Tax election (including any election pertaining to net operating losses) or settle or compromise any material Tax liability, or change or make a request to any Governmental Entity to change in any adverse manner any material aspect of its method of accounting for Tax purposes;

(r)      compromise, waive or settle any pending material Action;

(s)      effectuate a "plant closing" or "mass layoff," as those terms are defined in the Worker Adjustment and Retraining Notification Act of 1988, as amended, or a "mass layoff," "relocation," or "termination" under California Labor Code Sections 1400 et. seq., affecting in whole or in part any site of employment, facility, operating unit or employee of the Company or any of its Subsidiaries;

(t)      grant any material refunds, credits, rebates or other allowances by the Company to any end user, customer, reseller or distributor, in each case, other than in the Ordinary Course of Business;

(u)      authorize any of, or commit, resolve or agree to take any of, the foregoing actions;

(v)      make any filings or registrations, with any Governmental Entity, except routine filings and registrations made in the Ordinary Course of Business;

(w)      amend, terminate or modify in any respect the Amended King Retention Agreement; or

(x)      agree, whether in writing or otherwise, to do any of the foregoing.

Notwithstanding anything to the contrary in Section 4.1, during the Pre-Closing Period the Company may, after providing notice to Parent in the Company's sole discretion and without the consent of Parent, comply with its legally binding obligations under any Contracts in effect as of the date of this Agreement that have been Made Available to Parent in accordance with the terms of such Contracts.

4.2      No Solicitation by the Company.

(a)      Subject to Sections 4.2(b) and 4.2(c) except with respect to this Agreement and the transactions contemplated hereby, neither the Company nor any of its Subsidiaries shall, nor shall the Company or any of its Subsidiaries authorize or permit any of its or their respective directors, officers, employees and other agents and representatives (including any investment banking, legal or accounting firm retained by it or any of them and any individual member or employee of the foregoing) (each, a "Representative") to: (i) initiate, solicit, knowingly encourage or seek, directly or indirectly, the submission of any Third Party Proposal to the Company, any of its Subsidiaries or any of their respective Representatives; (ii) engage in any negotiations concerning, or provide any nonpublic information relating to the Company or any of its Subsidiaries to, or have any substantive discussions with, any Person relating to a Third Party Proposal; (iii) otherwise cooperate in or knowingly facilitate any effort or attempt to make, implement or accept a Third Party Proposal; (iv) enter into a Contract with any Person (other than the Company's investment banking, legal or accounting firms or other advisors or consultants) relating to a Third Party Proposal or (v) release any Person from, or waive any provision of, any confidentiality agreement to which it is a party in connection with any Third Party Proposal. "Third Party Proposal" means any proposal or offer (including any proposal or offer to the shareholders of the Company) with respect to a proposed or potential

Acquisition Transaction from a Person other than Parent or its Affiliates or their respective Representatives (in their capacities as such). "Acquisition Transaction" means: (A) any sale, lease or other disposition, direct or indirect (and however structured), of any business or assets of the Company or any of its Subsidiaries (which business or assets represent 15% or more of the consolidated assets of the Company and its Subsidiaries, taken as a whole); (B) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in a Person (other than Parent or its Affiliates) acquiring beneficial ownership of 15% or more of the outstanding Company Common Stock; (C) a merger, consolidation, share exchange, business combination, reorganization, joint venture, recapitalization, liquidation, dissolution or other similar transaction involving the Company or any of its Subsidiaries (which Subsidiaries represent 15% or more of the consolidated assets of the Company and its Subsidiaries, taken as a whole), in each such case in this clause (C) which would result in a Person (other than Parent or its Affiliates) acquiring beneficial ownership of (i) 15% or more of the outstanding voting capital stock of the Company or (ii) 15% or more of the consolidated assets of the Company and its Subsidiaries; or (D) the issuance, sale or other disposition, direct or indirect (and however structured), of securities (or securities or other rights convertible into, or exercisable or exchangeable for, such securities) representing 15% or more of the voting power of the outstanding voting capital stock of the Company.

(b)     Notwithstanding anything to the contrary in this Agreement, prior to but not after receipt of the Company Shareholder Approval, the Board of Directors of the Company may furnish information to, enter into discussions or negotiations with and cooperate in or facilitate any effort or attempt to make, implement or accept a Third Party Proposal from, a Person (or a Representative of a Person) who has made a written bona fide Third Party Proposal not solicited in violation of Section 4.2(a) if, and only if, the Board of Directors of the Company has (i) determined (after receiving the advice of a financial advisor of nationally recognized reputation) that such Third Party Proposal constitutes or would reasonably be expected to lead to a Superior Proposal, (ii) determined (after receiving the advice of the Company's outside legal counsel) that, in light of such Third Party Proposal, the failure to take such actions would be reasonably likely to result in a breach of its fiduciary obligations to the Company or the Company's shareholders under applicable Law, (iii) provided written notice to Parent of its intent to furnish information or enter into discussions or negotiations with such Person at least 24 hours prior to taking any such action and (iv) obtained from such Person an executed confidentiality agreement containing terms relating to confidentiality that are no less favorable to the Company than those contained in the Confidentiality Agreement. The Company shall furnish contemporaneously to Parent all nonpublic information provided to the Person who has made the Third Party Proposal to the extent that such information has not been previously provided to Parent and shall keep Parent reasonably informed as to the status of any discussions with the Person that made the Third Party Proposal and its Representatives regarding such Third Party Proposal. Notwithstanding the foregoing, no information may be furnished and no discussions may be entered into in connection with any Third Party Proposal that has resulted, directly or indirectly, from a breach of Section 4.2(a) or Section 4.2(d). "Superior Proposal" means a written bona fide Third Party Proposal not solicited in violation of Section 4.2(a) pursuant to which a Person (or its shareholders) would own, if consummated, at least 75% of the outstanding capital stock of the Company (or of the surviving entity in a merger or the direct or indirect parent of the surviving entity in a merger) or at least 75% of all the assets of the Company and its Subsidiaries taken as a whole on terms that the Board of Directors of the Company determines in good faith

(after receiving the advice of a financial advisor of nationally recognized reputation) to be more favorable to the Company's shareholders from a financial point of view than the terms of the Merger, and taking into account the terms and conditions of the Third Party Proposal, including any break-up fees, expense reimbursement provisions and conditions to consummation. In addition to the obligations of the Company set forth in this Section 4.2(b), the Company shall promptly, but in no event later than 24 hours after any officer or director of the Company becomes aware that any Third Party Proposal has been received by the Company, or any inquiry or request for information that the Company believes would reasonably be expected to lead to a Third Party Proposal has been received by the Company, advise Parent in writing of (i) any such Third Party Proposal, (ii) any inquiry or request for information that the Company reasonably believes could lead to a Third Party Proposal, and (iii) the terms and conditions of any such Third Party Proposal, request or inquiry and the identity of the Person making the Third Party Proposal, inquiry or request. The Company shall keep Parent informed in all material respects on a timely basis of any material change in the status of, or any material modification or material amendment to, any Third Party Proposal. Notwithstanding anything to the contrary in this Agreement, the Board of Directors of the Company may provide any nonpublic information relating to the Company or any of its Subsidiaries to, and engage in substantive discussions with, any of its Representatives relating to any Third Party Proposal (other than, except as otherwise expressly permitted by this Section 4.2(b), any individual Representative who, to the Knowledge of the Company, has a direct or indirect material interest in such Third Party Proposal other than as a result of being a Representative or security holder of the Company). For the avoidance of doubt, the Parties agree that the Board of Directors of the Company may not take any of the actions set forth in the first sentence of this paragraph on or after the Company's receipt of the Written Consent.

(c)     Nothing in this Agreement shall prevent the Board of Directors of the Company from withholding, withdrawing, amending, modifying or changing its recommendation in favor of the Company Shareholder Approval (such recommendation being referred as the "Company Board Recommendation") and, in the case of a tender or exchange offer by a Person other than Parent and its Affiliates made directly to the Company's shareholders, recommending that the Company's shareholders accept the tender or exchange offer (each, a "Change of Company Recommendation") if, prior to receipt of the Company Shareholder Approval, the Board of Directors of the Company determines in good faith (after receiving the advice of its outside legal counsel) that the failure of the Board of Directors to effect a Change of Company Recommendation would be reasonably likely to result in a breach of its fiduciary obligations to the Company's shareholders under applicable Law.

(d)     The Company (i) shall, and shall cause its Subsidiaries and Representatives to, cease existing discussions or negotiations with any Persons with respect to a Third Party Proposal made by such Person as of the date of this Agreement, and (ii) shall instruct any third party in possession of confidential information about the Company that was furnished by or on behalf of the Company with respect to any Third Party Proposal within the twelve months prior to the date of this Agreement to return or destroy all such information unless such third party (and its Representatives) has already been so instructed, subject to the terms of any existing confidentiality or nondisclosure agreement between the Company and such third party.

4.3     Employee Benefit Matters.

(a)    Unless Parent delivers written notice to the Company no later than five Business Days prior to the Effective Time providing otherwise, the Company shall take all action necessary to terminate, or cause to be terminated, before the Effective Time, any Company Benefit Plan that is a 401(k) plan or other defined contribution retirement plan.

(b)    As soon as reasonably practicable after the Effective Time, Parent shall provide the employees of the Company and its Subsidiaries who remain employed after the Effective Time ("Continuing Employees") with substantially similar types and levels of ERISA Benefit Plans as those provided to similarly situated employees of Parent, subject to the terms and conditions of such benefit plans, including but not limited to, eligibility conditions. With regard to any Equity Benefit Plan and any ERISA Benefit Plan for which service with Parent or any affiliate of Parent is relevant for purposes of eligibility to participate and vesting, including applicability of minimum waiting periods for participation, but not for benefit accrual or accrual rates, Parent shall treat and cause its Equity Benefit Plans and ERISA Benefit Plan to treat the service of the Continuing Employees with the Company or any Subsidiary of the Company prior to the Effective Time as service rendered to Parent or any affiliate of Parent for purposes of eligibility to participate and vesting, including applicability of minimum waiting periods for participation, but not for benefit accrual or accrual rates. Promptly following the date of this Agreement, the Company shall deliver to Parent a true and correct schedule setting forth such service for each employee of the Company. Parent shall use commercially reasonable efforts to ensure that no Continuing Employee, nor any eligible dependents of a Continuing Employee who, at the Effective Time, are participating in the Company group health plans, shall be excluded from Parent's group health plans, or limited in coverage thereunder, by reason of any waiting period restriction or pre-existing condition limitation. Parent shall use commercially reasonable efforts to ensure that Continuing Employees are given credit for amounts paid under a Benefit Plan during the plan year that includes the Effective Time for purposes of applying deductibles, co-payments, and out-of-pocket maximums, as though such amounts had been paid in accordance with the terms and conditions of a similar Benefit Plan maintained by Parent for the plan year in which the Effective Time occurs. Notwithstanding the foregoing, Parent shall not be required to provide any coverage, benefits, or credit that is not permitted under the terms of Parent's Equity Benefit Plans and ERISA Benefit Plans.

(c)    The provisions of this Section 4.3 are solely for the benefit of the respective parties to this agreement and nothing in this Section 4.3, express or implied, shall confer upon any Continuing Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or continued employment for any specified period, or compensation or benefits of any nature or kind whatsoever under this Agreement. Nothing in this Section 4.3, expressed or implied, shall be construed to prevent Parent from terminating or modifying to any extent or in any respect any benefit plan that the Parent may establish or maintain.

4.4    Resignations. On the Closing Date, the Company shall cause to be delivered to Parent duly signed resignations, effective immediately at the Effective Time, of all members of the boards of directors of the Company and its Subsidiaries of their positions as directors and of all officers of the Company and its Subsidiaries of their positions as officers.

4.5    Consents. The Company shall, and shall cause each of its Subsidiaries to, use its

reasonable best efforts to obtain all Consents; provided that no Indebtedness shall be repaid, except as otherwise required pursuant to the terms of any applicable loan Contract, and no Contract shall be amended nor any right thereunder be waived.

4.6     Representative Agreement. The Company shall deliver the Representative Agreement to each Company Shareholder with a request that such Company Shareholder execute and return the Representative Agreement promptly.

4.7     FIRPTA Certificate. The Company shall prepare and deliver to Parent at the Closing a properly executed statement in a form attached Exhibit G hereto, for purposes of satisfying Parent's obligations under Treasury Regulation Section 1.1445-2(c)(3) (the "FIRPTA Certificate").

4.8     Excise Tax. Prior to the Closing Date, the Company shall deliver to Parent evidence reasonably satisfactory to Parent that either (i) with respect to any payments or benefits that would constitute "parachute payments" within the meaning of Section 280G(b)(2) of the Code ("Potential 280G Benefit"), the Company's stockholders have approved (in a manner consistent with the regulations under Section 280G of the Code) each Potential 280G Benefit, or (ii) that such requisite shareholder approval has not been obtained (after having been sought in a manner that is consistent with the regulations under Section 280G of the Code) with respect to each Potential 280G Benefit and therefore any such Potential 280G Benefit has ceased to be payable or provided.

4.9     Warrant Cancellation Agreements; Exchangeable Share Conversion. Prior to the Closing Date, the Company shall use its reasonable best efforts to (a) obtain all required Warrant Cancellation Agreements, and (b) effect the Exchangeable Share Conversion.

4.10     Payment of Indebtedness. Prior to the Closing the Company shall obtain payoff letters ("Payoff Letters") relating to the amount of all Indebtedness for borrowed money, which shall provide that, upon payment in full of the Indebtedness indicated thereon, all Liens in respect of such Indebtedness shall be released. At the Closing, Parent, either directly or indirectly through a subsidiary of Parent, shall make payment of all Indebtedness of borrowed money referenced in the Payoff Letters.

ARTICLE V

ADDITIONAL AGREEMENTS

5.1     Company Shareholder Approval. Immediately following the execution of this Agreement, the Company shall deliver to Parent evidence of the Company Shareholder Approval in the form of a written consent in lieu of a meeting (the "Written Consent"), together with an irrevocable voting proxy in favor of Parent to approve an adopt this Agreement and the Merger, which shall be filed with the Secretary of the Company and shall be irrevocable. Following receipt of the Company Shareholder Approval, the Company shall promptly deliver to any Company Shareholder who has not approved this Agreement and the transactions contemplated hereby a notice of the approval of the Merger and adoption of this Agreement by written consent of the Company Shareholders pursuant to the applicable provisions of the CGCL, which notice

shall constitute the notice to Company Shareholders required by applicable law that dissenters' may be available to Company Shareholders in accordance with the CGCL. Following receipt of the Written Consent, the Company shall not, without the consent of Parent, take any action to hold a meeting of the Company's Shareholders or otherwise facilitate the revocation of the Company Shareholder Approval.

      5.2     Access to Information; Confidentiality; Cooperation with Financing.

      (a)     During the Pre-Closing Period, the Company shall provide, and shall cause its Subsidiaries and their respective Representatives, to provide, to Parent and to the Representatives of Parent, reasonable access during normal business hours without undue disruption of their respective businesses, to all their respective properties, books, contracts, commitments, personnel and records (to the extent reasonably available) and, during such period, the Company shall, and shall cause each of its Subsidiaries to, promptly deliver or make available to Parent (i) a copy of each report, schedule, form, statement and other document filed by it, or correspondence or other written communications received by it, from a Governmental Entity during such period pursuant to the requirements of federal or state securities Laws and (ii) all other information concerning its business, properties and personnel as Parent may reasonably request; provided, however, that the Company shall not be required to permit any access, or to deliver or make available to Parent any information, to the extent that in the reasonable judgment of the Company, such action would (a) result in the disclosure of any trade secrets of third parties, (b) violate any contractual obligation of the Company with respect to confidentiality, (c) jeopardize protections afforded the Company under the attorney-client privilege or the attorney work product doctrine, or (d) violate any Law. Parent will hold, and will cause its respective officers, employees, attorneys, accountants and other representatives to hold, any nonpublic information in accordance with the terms of that certain confidentiality agreement dated May 2, 2007 (the "Confidentiality Agreement").

      (b)     During the Pre-Closing Period, the Company shall provide, and shall cause its Subsidiaries and their respective officers, employees, representatives and advisors, including legal and accounting, to provide, to Parent and to the officers, employees, attorneys, accountants and other representatives of Parent, all cooperation that may be reasonably requested by Parent in connection with Parent's financing of the consideration payable pursuant to Article II, including (i) participation in meetings, presentations, road shows, due diligence sessions and sessions with rating agencies, and (ii) assisting with the preparation of materials for rating agency presentations, offering documents, private placement memoranda, prospectuses and similar documents required in connection with Parent's financing of the consideration payable pursuant to Article II; provided, however, that nothing herein shall require such cooperation to the extent it would interfere unreasonably with the business or operations of the Company or its Subsidiaries or otherwise result in any significant interference with the prompt and timely discharge by such employees of their normal duties.

      5.3     Regulatory Approvals; Further Actions.

      (a)     Each of Parent, Merger Sub and the Company shall promptly apply for, and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things that are

necessary or advisable to consummate and make effective the Merger and the other transactions contemplated by this Agreement, including (i) the use of commercially reasonable efforts to cause the conditions in Article VI to be satisfied, (ii) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Entities and the making of all necessary registrations, filings and notices and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (iii) the obtaining of all necessary consents, approvals or waivers from third parties and (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

(b)    Without limiting the generality of the foregoing, each of Parent and the Company shall, as promptly as practicable and before the expiration of any relevant legal deadline file with the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") or applicable foreign antitrust regulators, the notification and report form required for the transactions contemplated hereby and any supplemental information requested in connection therewith pursuant to the HSR Act or applicable foreign antitrust laws, which forms shall specifically request early termination of the waiting period prescribed by the HSR Act or applicable foreign antitrust laws. Each of the Company and Parent shall furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that may be necessary under the HSR Act or applicable foreign antitrust laws.

(c)    Each of Parent and the Company shall use its commercially reasonable efforts to obtain promptly any clearance required under the HSR Act or applicable foreign antitrust laws for the consummation of the Merger and the transactions contemplated hereby. Each of Parent and the Company shall keep the other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC and the DOJ or any applicable foreign antitrust regulators and shall use its commercially reasonable efforts to comply promptly with any such inquiry or request. No Party hereto shall independently participate in any meeting or discussion with any Governmental Entity in respect of any filings, applications, investigations, or other inquiry without giving the other Parties hereto prior notice of the meeting and, to the extent permitted by the relevant Governmental Entity, the opportunity to attend and participate (which shall be limited to outside antitrust counsel only). Parent will consult with the Company in connection with the preparation of all written presentations, memoranda, briefs, arguments, opinions, proposals, or other written submissions to any Government Entity that are prepared in connection with obtaining the clearance required under the HSR Act or applicable foreign antitrust laws for the consummation of the Merger and the transactions contemplated hereby. Notwithstanding the foregoing, (i) if the taking of the particular action would have (or would reasonably be expected to have) a Material Adverse Effect on the business, condition (financial or otherwise) or results of operations of the Surviving Corporation or Parent, after the Merger, Parent shall not be required to (A) consent to the divestiture, license or other disposition or holding separate (through the establishment of a trust or otherwise) of any of its or its Affiliates' assets or any assets of the Surviving Corporation or any of its Subsidiaries or (B) consent to any other structural or conduct remedy or enter into any settlement or agree to any Order regarding antitrust matters respecting the transactions contemplated by this Agreement and (ii) Parent and its Affiliates shall have no obligation to

contest, in an administrative proceeding or in court, any ruling, Order or other action of any Governmental Entity or any other Person respecting the transactions contemplated by this Agreement.

(d)    Parent and the Company shall instruct their respective counsel to cooperate with each other and use commercially reasonable efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act or applicable foreign antitrust laws and the expiration of the applicable waiting period under the HSR Act or any applicable foreign antitrust laws at the earliest practicable date. Such commercially reasonable efforts and cooperation include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Entity and (ii) to confer with each other regarding appropriate contacts with and response to personnel of any Governmental Entity.

5.4    Public Announcements. Unless otherwise required by applicable Law, Parent and Merger Sub, on the one hand, and the Company, on the other hand, shall, to the extent practicable, consult with each other before issuing, and give each other a reasonable opportunity to review and comment upon, any press release or other public statements with respect to this Agreement, the Merger and the other transactions contemplated hereby. The Parties agree that the initial press release to be issued with respect to the entering into of this Agreement shall be in a form mutually agreeable to the Parties.

5.5    Directors' and Officers' Insurance and Indemnification.

(a)    From and after the Effective Time, the Surviving Corporation shall (and Parent shall cause the Surviving Corporation to) fulfill and honor in all respects all rights to indemnification, advancement of litigation expenses and limitation of personal liability or exculpation ("D&O Obligations") existing in favor of the current and former directors, officers and employees of the Company and its Subsidiaries under the provisions existing on the date of this Agreement in the Company's Articles of Incorporation or Bylaws or the organizational documents of any of the Company's Subsidiaries, or in any other indemnification agreements between such individuals and either the Company or any of its Subsidiaries, that are in effect prior to the date of this Agreement, and all such provisions shall, with respect to any matter existing or occurring at or prior to the Effective Time (including the transactions contemplated by this Agreement), survive the Effective Time.

(b)    For a period of six years after the Effective Time, the Surviving Corporation shall (and Parent shall cause the Surviving Corporation to) cause to be maintained in effect the current policies of directors' and officers' and fiduciary liability insurance maintained by the Company (provided that the Surviving Corporation may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are no less advantageous to former officers and directors of the Company) only with respect to claims arising from facts existing or events which occurred at or before the Effective Time; provided, however, that in no event shall the Surviving Corporation be required to expend pursuant to this Section 5.5(b) more than an aggregate amount as set forth on Schedule 5.5(b), which amount equals 250% of the current aggregate annual premiums paid by the Company for such insurance, and if the amount of the aggregate annual premiums necessary to maintain or procure such

insurance coverage exceeds such maximum amount, the Surviving Corporation during such six-year period shall maintain or procure as much coverage as possible for aggregate annual premiums not to exceed such maximum amount. In lieu of the foregoing, Parent shall be entitled to purchase a tail policy providing at least the same coverage and amounts and containing terms and conditions that are no less advantageous to former officers and directors of the Company as the current policies of directors' and officers' and fiduciary liability insurance maintained by the Company, covering the period of six years after the Effective Time.

(c)     The provisions of this Section 5.5 are intended to be for the benefit of, and will be enforceable by, each indemnified party, his or her heirs and his or her representatives, and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by contract or otherwise.

5.6    Notification of Certain Matters.

(a)     During the Pre-Closing Period, the Company shall give prompt notice to Parent of (i) any fact, event or circumstance occurring after the date of this Agreement that, individually or in the aggregate, (A) has caused or would reasonably be expected to have, a Material Adverse Effect on the Company, or (B) would cause or constitute a material breach of any of the Company's representations, warranties, covenants or agreements contained in this Agreement, (ii) any written notice (or other communication to any officer of the Company or any of its Subsidiaries) from any third party alleging that the consent of such third party is or may be required in connection with the Merger, (iii) any written notice (or other communication of which any officer of the Company or any of its Subsidiaries becomes aware) from any Governmental Entity in connection with the Merger, or (iv) the pendency or existence of any fact, event or circumstance that, if pending or in existence on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.1(h); provided, however, that (x) the delivery of any notice pursuant to this Section 5.6(a) shall not limit or otherwise affect any remedies available to Parent or prevent or cure any misrepresentations, breach of warranty or breach of covenant, and (y) the delivery of any notice pursuant to this Section 5.6(a) shall not be deemed to amend or supplement the Disclosure Schedule or constitute an exception to any representation or warranty of the Company; provided, further, that the failure to deliver any notice pursuant to this Section 5.6(a) shall not be considered in determining whether the condition set forth in Section 6.2(b) has been satisfied (and consequently whether Parent may terminate this Agreement pursuant to Section 7.1(d)).

(b)     During the Pre-Closing Period, Parent shall give prompt notice to the Company of (i) any fact, event or circumstance occurring after the date of this Agreement that, individually or in the aggregate, would cause or constitute a material breach of any of Parent's or Merger Sub's representations, warranties, covenants or agreements contained in this Agreement, (ii) any written notice (or other communication of which any officer of Parent becomes aware) from any third party alleging that the consent of such third party is or may be required in connection with the Merger, or (iii) any written notice (or other communication to any officer of Parent or any of its Subsidiaries) from any Governmental Entity in connection with the Merger or the transactions contemplated by the Underwriting Agreement; provided, however, that (x) the delivery of any notice pursuant to this Section 5.6(b) shall not limit or otherwise affect any remedies available to the Company or prevent or cure any misrepresentations, breach of warranty

or breach of covenant, and (y) the delivery of any notice pursuant to this Section 5.6(b) shall not be deemed to constitute an exception to any representation or warranty of Parent or Merger Sub; provided, further, that the failure to deliver any notice pursuant to this Section 5.6(b) shall not be considered in determining whether the condition set forth in Section 6.3(b) has been satisfied (and consequently whether the Company may terminate this Agreement pursuant to Section 7.1(e)).

     5.7    <u>Operations of Merger Sub</u>. During the Pre-Closing Period, Merger Sub shall not, and Parent shall not permit Merger Sub to, engage in any other business activities other than in connection with the transactions contemplated hereby and the obtaining of financing for the consideration payable pursuant to Article II.

     5.8    <u>Underwriting Agreement</u>. Without the prior written consent of the Company, which shall not be unreasonably withheld or delayed in situations where the matter for which consent is sought would not reasonably be expected to preclude or materially impede the consummation of the transactions contemplated by this Agreement, Parent shall not terminate the Underwriting Agreement or amend or modify any term of the Underwriting Agreement or agree to or permit (where permission is sought or required) any termination of the Underwriting Agreement or any amendment or modification to any term of the Underwriting Agreement, waive any provision or remedy under the Underwriting Agreement, or fail to enforce any of its rights or remedies under the Underwriting Agreement if any such action or failure to take action would preclude or materially impede the consummation of the transactions contemplated by this Agreement. Parent shall keep the Company informed in all material respects on a timely basis of any material modification or material amendment to the Underwriting Agreement. Parent shall notify the Company promptly (and in any event within two Business Days) of Parent having Knowledge of (i) any inaccuracy in any representation or warranty in the Underwriting Agreement of Parent or any other party to the Underwriting Agreement, (ii) any breach of any covenant or agreement in the Underwriting Agreement by Parent or any other party to the Underwriting Agreement, (iii) the expiration, termination, modification or amendment of the Underwriting Agreement, (iv) the existence of any fact, event or circumstance that, individually or in the aggregate with all other facts, events or circumstances, has had or would reasonably be expected to have an adverse effect on Parent's ability to obtain the financing contemplated by the Underwriting Agreement, and (v) any proposal by any party to the Underwriting Agreement to terminate, modify or amend the Underwriting Agreement in any material respect. Parent shall use its reasonable best efforts to (i) satisfy all funding conditions set forth in the Underwriting Agreement (and in particular, but without limitation, Parent shall use all reasonable best efforts to provide such information, supply such documents, pay such commercially reasonable fees, give such commercially reasonable undertakings and do all such acts and things as may be required to satisfy the condition set forth in Section 6.2(e)), (ii) consummate the financings contemplated by the Underwriting Agreement within five Business Days following the date of this Agreement, including by complying with all reasonable requests or requirements of the other parties to the Underwriting Agreement, (iii) perform all of its obligations under the Underwriting Agreement, including executing and delivering the Terms of Sale (as defined in the Underwriting Agreement) with a placing price equal to the Backstop Price (as defined in the Underwriting Agreement) or such higher price as may be agreed upon pursuant to the Underwriting Agreement), and (iv) not commit any breach of or otherwise cause or permit any default under the Underwriting Agreement.

5.9    Listing. The Board of Directors of Parent shall allot the requisite number of Parent Ordinary Shares necessary to cover all Assumed Options and shall use its commercially reasonable best efforts to have (i) the UKLA agree to admit such Parent Ordinary Shares to the Official List of the UKLA and (ii) the LSE agree to admit such Parent Ordinary Shares to trading on its market for listed securities, in each case subject only to allotment.

## ARTICLE VI

## CONDITIONS PRECEDENT

6.1    Conditions to Each Party's Obligation to Effect the Merger. The respective obligations of each Party to effect the Merger is subject to the satisfaction or written waiver by the Parties, on or prior to the Closing Date, of the following conditions:

(a)    Company Shareholder Approval. The Company Shareholder Approval shall have been obtained and shall continue to be in full force and effect.

(b)    Antitrust. Any waiting period (and any extension thereof) applicable to the Merger under the HSR Act or applicable foreign antitrust laws shall have been terminated or shall have expired.

(c)    No Legal Restraints. No temporary restraining Order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction or other legal restraint or prohibition (collectively, "Legal Restraints") that has the effect of preventing the consummation of the Merger shall be in effect, where the violation of such Order or injunction that would occur if the Merger were consummated would reasonably be expected to have a Material Adverse Effect on the Company or Parent.

6.2    Conditions to Obligation of Parent and Merger Sub. The obligations of Parent and Merger Sub to effect the Merger are further subject to the satisfaction or written waiver by Parent, on or prior to the Closing Date, of the following conditions:

(a)    Representations and Warranties. (i) The Company Specified Representations shall be accurate in all material respects as of the Closing Date as if made on and as of the Closing Date (except to the extent that any Company Specified Representation is expressly made as of an earlier date, in which case such Company Specified Representation shall have been accurate in all material respects as of such earlier date); (ii) the Company Other Representations, disregarding the phrase "in all material respects" or any Material Adverse Effect qualifications contained in the Company Other Representations, shall be accurate in all respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any Company Other Representation is expressly made as of an earlier date, in which case such Company Other Representation shall have been accurate in all respects as of such earlier date); provided, however, that any inaccuracies in the Company Other Representations shall be disregarded unless all such inaccuracies, considered collectively, shall have had, and shall continue to have, a Material Adverse Effect on the Company; and (iii) Parent shall have received a certificate signed on behalf of the Company by the Chief Executive Officer of the Company to the foregoing effect.

(b)     Performance of Obligations of the Company. The Company shall have performed any covenants or obligations required to be performed by it under this Agreement at or prior to the Closing in all material respects, and Parent shall have received a certificate signed on behalf of the Company by the Chief Executive Officer of the Company to such effect.

(c)     No Material Adverse Effect. There shall not have been any fact, event or circumstance occurring after the date of this Agreement that, individually or in the aggregate, has caused or would reasonably be expected to have, a Material Adverse Effect on the Company.

(d)     Other Deliveries. The Company shall have delivered or caused to be delivered to Parent:

(i)     a true and correct copy of the Agreement of Merger, duly executed by the Company;

(ii)     a certificate of the Secretary of the Company certifying as of the Closing Date (A) a true and correct copy of the organizational documents of the Company, including the Company's Articles of Incorporation certified as of a recent date by the Office of the Secretary of State of the State of California (the "California Secretary of State"), (B) a certificate of the California Secretary of State certifying the good standing of the Company in California as of a recent date, (C) a true and correct copy of the resolutions constituting the Company Board Approval and the Company Shareholder Approval and (D) as to incumbency matters;

(iii)     Warrant Cancellation Agreements from each holder of a Warrant to the extent required by Section 2.4(a)(v);

(iv)     evidence that the Exchangeable Share Conversion has occurred;

(v)     copies of the Payoff Letters;

(vi)     resignations from the directors and officers of the Company and each Subsidiary of the Company in office immediately prior to the Effective Time in form and substance reasonably satisfactory to Parent;

(vii)     the documentation required by Section 4.8;

(viii)     a duly executed and certified FIRPTA Certificate; and

(ix)     a certificate from the Chief Financial Officer of the Company certifying as to the amount of Net Debt and Company Transaction Expenses as of Closing in the form attached hereto as Exhibit I (the "CFO Certificate").

(e)     Financing. All of the conditions set forth in clause 2 of the Underwriting Agreement shall have been satisfied or waived and the Underwriting Agreement shall not have been terminated.

(f)     Appraisal Threshold. The holders of no more than five percent (5%) of the

Company Shares on an as-converted to Common Stock basis shall have demanded and not lost or withdrawn appraisal rights.

(g)    Employment Addendums. Each of the Key Employees who has executed and delivered to Parent an Employment Addendum shall be an employee of the Company immediately prior to the Effective Time.

(h)    Amended King Retention Agreement. Steven R. King shall have executed and delivered the Amended King Retention Agreement and such agreement shall be in full force and effect.

(i)    Escrow Agreement. The Escrow Agent and the Escrow Participants' Representative shall have duly executed and delivered the Escrow Agreement to Parent.

(j)    Opinion of Counsel. Parent shall have received the opinion of Wilson, Sonsini, Goodrich & Rosati, counsel to the Company, addressed to Parent, dated as of the Closing Date, in the form attached hereto as Exhibit H.

(k)    Listing. The UKLA shall have agreed to admit such New Parent Shares to the Official List of the UKLA and the LSE shall have agreed to admit such New Parent Shares to trading on its market for listed securities, in each case subject only to allotment.

(l)    Common Stock Equivalents. All outstanding Company Common Stock Equivalents other than Preferred Stock and Company Stock Options shall have been terminated or converted into, or exercised or exchanged for, shares of Company Common Stock. "Company Common Stock Equivalents" means options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or any other Contracts that, directly or indirectly, could require the Company to issue, sell or otherwise cause to become outstanding shares of Company Common Stock.

6.3    Conditions to Obligation of the Company. The obligation of the Company to effect the Merger is further subject to the satisfaction or written waiver by the Company, on or prior to the Closing Date, of the following conditions:

(a)    Representations and Warranties. (i) The Parent Specified Representations shall be accurate in all material respects as of the Closing Date as if made on and as of the Closing Date (except to the extent that any Parent Specified Representation is expressly made as of an earlier date, in which case such Parent Specified Representation shall have been accurate in all material respects as of such earlier date); (ii) the Parent Other Representations, disregarding the phrase "in all material respects" or any Material Adverse Effect qualifications contained in the Parent Other Representations, shall be accurate in all respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any Parent Other Representation is expressly made as of an earlier date, in which case such Parent Other Representation shall have been accurate in all respects as of such earlier date); provided, however, that any inaccuracies in the Parent Other Representations shall be disregarded unless all such inaccuracies, considered collectively, shall have had, and shall continue to have, a material adverse effect on Parent's or Merger Sub's ability to consummate the Merger or any of the transactions contemplated hereby; and (iii) the Company shall have received a certificate signed on behalf of Parent by the Chief

Executive Officer, Chief Financial Officer or Senior Vice President of Parent to the foregoing effect.

(b)    <u>Performance of Obligations of Parent and Merger Sub</u>. Parent and Merger Sub shall have duly performed any covenants or obligations required to be performed by them under this Agreement at or prior to the Closing in all material respects, and the Company shall have received a certificate signed on behalf of Parent by the Chief Executive Officer, Chief Financial Officer or Senior Vice President of Parent to such effect.

(c)    <u>Escrow Agreement</u>. The Escrow Agent and Parent shall have duly executed and delivered the Escrow Agreement to the Company.

(d)    <u>Listing</u>. The Board of Directors of Parent shall have resolved to allot the requisite number of New Parent Shares and (i) the UKLA shall have agreed to admit such New Parent Shares to the Official List of the UKLA and (ii) the LSE shall have agreed to admit such New Parent Shares to trading on its market for listed securities, in each case subject only to allotment.

ARTICLE VII

TERMINATION, AMENDMENT AND WAIVER

7.1    <u>Termination</u>. This Agreement may be terminated, and the Merger contemplated hereby may be abandoned, at any time prior to the Effective Time, whether before or after Company Shareholder Approval has been obtained and notwithstanding adoption of this Agreement by the shareholder of Merger Sub:

(a)    by mutual written consent of Parent and the Company duly authorized by each of their respective Boards of Directors;

(b)    by either Parent or the Company:

(i)    if the Merger shall not have been consummated by September 28, 2007 (the "End Date"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 7.1(b)(i) shall not be available to a Party if the failure of the Merger to have been consummated on or before the End Date was attributable to the failure of such Party (or, in the case of Parent, the failure of Merger Sub) to perform any of its obligations under this Agreement <u>provided</u>, <u>further</u>, that the End Date under this subsection shall automatically be extended to December 28, 2007 in that event that the condition(s) specified in either Section 6.1(b) and/or Section 6.1(c) (solely to the extent related to the HSR Act or applicable foreign antitrust laws) has not been satisfied as of September 28, 2007; or

(ii)    if any Legal Restraint the existence of which would cause the condition set forth in Section 6.1(c) not to be satisfied shall be in effect and shall have become final and nonappealable; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 7.1(b)(ii) shall not be available to a Party if the imposition of such Legal Restraint was attributable to the failure of such Party or any Affiliate of such Party to perform any of its obligations under this Agreement.

(c)    by Parent if the Written Consent is not delivered immediately after the execution and delivery of this Agreement or if the Company Shareholder Approval is subsequently revoked;

(d)    by Parent if the Company shall have breached any of its covenants or other agreements set forth in this Agreement, or if any representations or warranties of the Company shall have become inaccurate and in each case is incapable of being cured, or has not been cured, within 20 days after Parent's giving written notice to the Company of such breach or inaccuracy, which breach or inaccurate representation or warranty would give rise to the failure of a condition set forth in Section 6.2(a) or Section 6.2(b) (a "Company Material Breach") (provided that there is not then pending any Parent Material Breach); or

(e)    by Parent if (a) any director or officer of the Company shall have materially breached, or shall have directly or indirectly induced or knowingly encouraged any other Representative of the Company to materially breach, any of the provisions set forth in Section 4.2(a) or Section 4.2(d), or (b) there shall have occurred a Company Triggering Event (for purposes of this Agreement, "Company Triggering Event" means: (i) the failure of the Board of Directors of the Company to recommend that the Company's shareholders vote to adopt this Agreement, or any Change of Company Recommendation by the Company; (ii) the failure of the Company to include in the Information Statement the Company Board Approval or a statement to the effect that the Board of Directors of the Company has determined and believes that the Merger is in the best interests of the Company and the Company's shareholders; (iii) the Board of Directors of the Company shall have adopted a resolution approving, endorsing or recommending any Third Party Proposal; (iv) a tender or exchange offer relating to an Acquisition Transaction shall have been commenced and the Company shall not have sent to its shareholders, within 10 Business Days after such tender or exchange offer is publicly announced, a statement disclosing that the Board of Directors recommends rejection of such tender or exchange offer; (v) a Third Party Proposal is publicly announced, and the Company fails to publicly announce its opposition to such Third Party Proposal within 10 Business Days after such Third Party Proposal is publicly announced, provided that any right to terminate pursuant to this clause (v) must be exercised, if at all, by Parent within 30 days of the expiration of such 10-Business Day period; or (vi) the Company resolves (by resolution of its Board of Directors) or proposes publicly to take any actions described in clauses (i) through (v) above in response to such Third Party Proposal);

(f)    by the Company, if Parent or Merger Sub shall have breached any of its covenants or other agreements set forth in this Agreement or if any representations or warranties of Parent or Merger Sub shall have become inaccurate and in each case is incapable of being cured, or has not been cured, within 20 days after the Company's giving written notice to Parent of such breach or inaccuracy, which breach or inaccuracy would give rise to the failure of a condition set forth in Section 6.3(a) or Section 6.3(b) (a "Parent Material Breach") (provided that there is not then pending any Company Material Breach); or

(g)    by the Company, prior to but not after obtaining the Company Shareholder Approval, if the Board of Directors of the Company authorizes the Company, to the extent permitted by the terms of this Agreement, to accept (or to enter into a binding, written agreement for an Acquisition Transaction constituting) a Superior Proposal; provided, however, that the

Company shall have paid the Company Termination Fee to Parent pursuant to Section 7.3(b); provided, further, that (i) such Superior Proposal did not result, directly or indirectly, from a breach of Section 4.2(a) or Section 4.2(d), (ii) the Company notifies Parent, in writing at least 72 hours prior to such termination, of its intention to terminate this Agreement to accept (or to enter into a binding, written agreement for an Acquisition Transaction constituting) a Superior Proposal, attaching the most current version of such agreement executed on behalf of the Person proposing such Acquisition Transaction and all exhibits and other attachments thereto, subject only to acceptance by the Company by countersignature on behalf of the Company, and subject to no additional conditions to execution other than the condition that this Agreement be terminated, (iii) Parent does not make prior to such termination (and keep open for the remaining period referred to in clause (ii) above) a binding, unconditional offer (including the complete form of definitive acquisition agreement executed on behalf of Parent and all exhibits and other attachments thereto, subject only to acceptance by the Company by countersignature on behalf of the Company, and subject to no other conditions to execution) that the Board of Directors of the Company determines in its good faith judgment (after receiving the advice of the Company's financial advisor) is at least as favorable to the stockholders of the Company as such Superior Proposal, it being understood that the Company shall not enter into any such binding agreement during such 72-hour period.

7.2    Effect of Termination. In the event of termination of this Agreement by either the Company or Parent as provided in Section 7.1, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Parent, Merger Sub or the Company, other than this Section 7.2, Section 5.4, Section 7.3, Article VIII and Article IX; provided, however, that no such termination shall relieve any Party from any liability or damages resulting from (a) any breach of any covenant contained in this Agreement by such Party prior to such termination or (b) any willful breach of such Party's representations and warranties in this Agreement.

7.3    Fees and Expenses.

(a)    Subject to Sections 7.3(b), all fees, costs and expenses incurred in connection with this Agreement, the Merger and the other transactions contemplated hereby shall be paid by the Party incurring such fees or expenses, whether or not the Merger is consummated; provided, however, in the event that the Merger is consummated, the Merger Consideration will be reduced by the Company Transaction Expenses and certain other fees and expenses contemplated in Section 2.1.

(b)    The Company shall pay Parent, by wire transfer of immediately available funds to an account designated by Parent, the following fee (the "Company Termination Fee") if this Agreement is terminated as follows:

(i)    if Parent terminates this Agreement pursuant to Section 7.1(c), the Company shall pay Parent a Company Termination Fee equal to $5,000,000 on the first Business Day following the date of such termination if, at the time of such termination, (i) the Company has not satisfied the condition set forth in Section 6.1(a), and (ii) at least fifteen (15) calendar days have elapsed since all other conditions to the obligations of Parent to effect the Merger set forth in Article VI have been satisfied or waived by Parent (other than any condition that is

required to be satisfied by the Company);

        (ii)     if Parent terminates this Agreement pursuant to Section 7.1(e), the Company shall pay Parent a Company Termination Fee equal to $10,000,000 on the first Business Day following the date of such termination; or

        (iii)    if the Company terminates this Agreement pursuant to Section 7.1(g), the Company shall pay Parent a Company Termination Fee equal to $10,000,000 prior to such termination.

        (c)    In the event that the Company fails to pay the Company Termination Fee when due, the Company will also pay the costs and expenses of Parent or Merger Sub in connection with a legal action to enforce this Agreement.

    7.4    _Amendment_. This Agreement may be amended by the Parties at any time before or after Company Shareholder Approval is obtained and before or after adoption of this Agreement by the shareholder of Merger Sub; _provided_, _however_, that after the Company Shareholder Approval is obtained, there shall not be made any amendment that by Law requires further approval by the shareholders of the Company without the further approval of such shareholders. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

    7.5    _Extension; Waiver_. At any time prior to the Effective Time, a Party may (i) extend the time for the performance of any of the obligations or other acts of the other Parties, (ii) waive any inaccuracies in the representations and warranties of the other Parties contained in this Agreement or in any document delivered pursuant to this Agreement or (iii) waive compliance by the other Party with any of the agreements or conditions set forth in this Agreement. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party. Any waiver or failure to insist upon strict compliance with any obligation, covenant, agreement, provision, term or condition of this Agreement shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply. The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

ARTICLE VIII

INDEMNIFICATION

8.1    _Survival_.

    (a)    Except as set forth in Section 8.1(b), all representations and warranties, covenants and agreements of the Company contained in this Agreement, or in the certificates delivered pursuant to Sections 6.2(a), 6.2(b), 6.2(d)(ii), 6.2(d)(vii) and 6.2(d)(ix) hereof (the "Certificates"), shall survive the Closing until the earlier of (i) sixty (60) days following the completion of Parent's audit for the fiscal period ending December 31, 2007 and (ii) May 31, 2008.

    (b)    The representations and warranties of the Company contained in

Section 3.1(a) (Organization, Standing and Corporate Power), 3.1(c) (Capital Structure), 3.1(d) (Authority; Noncontravention) and 3.1(y)(i) (Brokers; Schedule of Fees) shall survive indefinitely. The representations and warranties of the Company contained in Section 3.1(q) (Taxes) and 3.1(p) (Employee Benefit Matters) shall survive the Closing until 60 days after the expiration of the applicable statute of limitations period (after giving effect to any waivers and extensions thereof). The representations and warranties of the Company contained in Section 3.1(r) (Environmental) shall survive the Closing for a period of three years following the Closing.

(c)     The period for which a representation or warranty, covenant or agreement survives the Closing is referred to herein as the "Applicable Survival Period." In the event a Notice of Claim for indemnification under Section 8.2 is given within the Applicable Survival Period, the representation or warranty, covenant or agreement that is the subject of such indemnification claim (whether or not formal legal action shall have been commenced based upon such claim) shall survive with respect to such claim until such claim is finally resolved. The Indemnor shall indemnify the Indemnitee for all Losses (subject to the limitations set forth herein, if applicable) that the Indemnitee may incur in respect of such claim, regardless of when incurred.

(d)     All representations and warranties of Parent contained in this Agreement, or in any certificate or other document delivered pursuant hereto, shall expire as of the Closing.

8.2    Indemnification by Escrow Participants.

(a)     Subject to the limitations set forth in this Article VIII, each Escrow Participant (collectively, the "Indemnitors") shall indemnify and defend Parent and its Affiliates and their respective shareholders, members, managers, officers, directors and employees (collectively, the "Parent Indemnitees") against, and shall hold them harmless from, any and all losses, damages, claims (including third party claims), charges, interest, penalties, taxes, diminution in value, costs and expenses (including legal, consultant, accounting and other professional fees, costs of sampling, testing, investigation, removal, treatment and remediation of contamination and fees and costs incurred in enforcing rights under this Section 8.2, but excluding (x) exemplary or punitive damages, and (y) any losses for the alleged diminution in value of Parent's equity market capitalization in and of itself, provided that the foregoing shall not limit any losses underlying such diminution in value of Parent's equity market capitalization that are otherwise subject to indemnification hereunder)(collectively, "Losses") resulting from:

(i)     the failure of any representation and warranty or other statement by the Company contained in this Agreement or any Certificate to be true and correct in all respects as of the date of this Agreement and as of the Closing Date;

(ii)    any breach of any covenant or agreement of the Company contained in this Agreement;

(iii)   any Tax imposed on or relating to the Company or any of its Subsidiaries with respect to any taxable period (or portion thereof) that ends on or before the Closing Date to the extent that such Taxes exceed the amount, if any, reserved for such Taxes

(excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) on the face of the Balance Sheet (rather than in any notes thereto) as adjusted to reflect Taxes incurred in the Ordinary Course of Business between the Balance Sheet Date and the Closing Date that are not due and payable at the Closing Date;

(iv)    to the extent that Parent or the Company makes any payment in respect of any Dissenting Shares, (i) the aggregate amount by which such payment exceeds the Merger Consideration that would be payable with respect to such shares pursuant to Section 2.4(a)(iii), and (ii) any other costs and expenses, including attorney fees and expenses, incurred in connection with investigating, defending and settling such demands for appraisal; and

(v)    Company Transaction Expenses or Net Debt, to the extent such Company Transaction Expenses or Net Debt have not reduced the Merger Consideration pursuant to Section 2.1.

Any and all Losses hereunder shall bear interest from the date incurred until paid at the Interest Rate.

(b)    The Indemnitors shall not be liable for any Loss or Losses pursuant to Section 8.2(a) (a) solely to the extent that such Loss or Losses decreased the amount of Final Working Capital and (b) with respect to any Loss or Losses pursuant to Section 8.2(a)(i) ("Warranty Losses"), unless and until the aggregate amount of all such Warranty Losses incurred by the Parent Indemnitees exceeds $250,000 (the "Indemnification Threshold"), in which case the Parent Indemnitees may make claims for indemnification and may receive cash from the Escrow Fund for all such Warranty Losses.

8.3    Indemnity Escrow Fund.

(a)    The Indemnity Escrow Fund (other than the Representative Reserve Amount) shall be available to compensate the Parent Indemnitees pursuant to the indemnification obligations of the Indemnitors. The Indemnity Escrow Fund shall be held and disbursed by the Escrow Agent in accordance with the Escrow Agreement. Subject to and in accordance with the Escrow Agreement, once the Indemnification Threshold has been reached, the full amount of all Losses (aggregating all of the claims against the Indemnitors) shall be subject to indemnification and an amount shall be released to Parent from the Indemnity Escrow Fund (other than the Representative Reserve Amount) equal to the amount of all such Losses.

(b)    The Indemnitors shall not have any right of indemnification or contribution from Parent or the Surviving Corporation with respect to any Loss claimed by any Parent Indemnitee after the Effective Time. The Indemnitors acknowledge and agree that, if the Surviving Corporation suffers, incurs or otherwise becomes subject to any Losses as a result of or in connection with any inaccuracy in or breach of any representation, warranty, covenant or agreement, then (without limiting any of the rights of the Surviving Corporation as a Parent Indemnitee) Parent shall also be deemed, by virtue of its ownership of the stock of the Surviving Corporation, to have incurred Losses as a result of and in connection with such inaccuracy or breach.

(c)    Except as provided in Section 8.3(d) and 8.3(e), the Indemnity Escrow

Fund (other than the Representative Reserve Amount) shall be the exclusive post-Closing source of recovery for indemnifiable Losses pursuant to Section 8.2 hereof.

(d) The limitation set forth in Section 8.3(c) shall not apply to Losses ("Special Losses") resulting from breach of any representation or warranty contained in Section 3.1(a) (Organization, Standing and Corporate Power), 3.1(c) (Capital Structure), 3.1(d) (Authority; Noncontravention) or 3.1(y)(i) (Brokers; Schedule of Fees). The Escrow Participants shall be severally (pro rata based on the amount of Merger Consideration to which such Escrow Participant is entitled to receive), and not jointly, liable for the amount by which any Special Losses exceed the Indemnity Escrow Fund (less the Representative Reserve Amount); provided that Parent shall first satisfy any claim with respect to Special Losses in full out of the Indemnity Escrow Fund (other than the Representative Reserve Amount) before seeking indemnification directly from any Escrow Participant; provided, further, that the aggregate maximum liability of any Escrow Participant for any and all Losses, including Special Losses, shall be limited to the value of the total Merger Consideration such Escrow Participant received pursuant to this Agreement and the aggregate maximum liability of any Escrow Participant for any and all Losses resulting from breach of any representation or warranty contained in Section 3.1(r) (Environmental) and 3.1(p) (Employee Benefit Matters) in excess of the Indemnity Escrow Fund (less the Representative Reserve Amount) shall be limited to $2,000,000.

(e) Nothing contained in this Article VIII shall be deemed to limit or restrict in any manner any rights or remedies which the Parent Indemnitees have, or might have, at Law, in equity or otherwise, or the liability of any Person based on (i) fraud or a willful misrepresentation or a knowing and willful breach by any such Person of any covenant or agreement contained in this Agreement or any Certificate furnished or to be furnished to Parent in connection with the transactions contemplated hereby or (ii) any breach by such Person of any representation and warranty and covenant or agreement contained in any other agreement entered into by such Company Securityholder with or for the benefit of Parent in connection with the Merger.

(f) The adoption of this Agreement by the Company Shareholders and acceptance of Merger Consideration pursuant to Article II of the other Company Securityholders constitute approval of the indemnification obligations of the Escrow Participants set forth in this Article VIII.

8.4    Third Party Claims.

(a) In the event that a Parent Indemnitee receives notice of the assertion of any claim or the commencement of any Action by a third party in respect of which indemnity may be sought under the provisions of this Article VIII, or reasonably believes that any such claim will be asserted or commenced ("Third Party Claim"), Parent shall notify the Escrow Participants' Representative in writing of such Third Party Claim ("Notice of Claim") and concurrently therewith shall send a duplicate copy of such Notice of Claim to the Escrow Agent. The Notice of Claim shall set forth: (i) that a Parent Indemnitee has incurred Losses or anticipates that it will incur Losses for which such Parent Indemnitee is entitled to indemnification pursuant to this Agreement; (ii) the amount of such Losses, if known, or, if not known, a reasonable estimate of the foreseeable maximum amount of such Losses (which

estimate shall not be conclusive of the final amount of such Losses); and (iii) a description of the basis for such Third Party Claim. Failure or delay in notifying the Escrow Participants' Representative will not relieve the Indemnitors of any liability they may have to the Parent Indemnitee, except and only to the extent that such failure or delay causes actual harm to the Indemnitors with respect to such Third Party Claim.

(b)      Subject to the further provisions of this Section 8.4, the Escrow Participants' Representative will have 10 Business Days from the date on which the Escrow Participants' Representative received the Notice of Claim to notify the Parent Indemnitee that the Escrow Participants' Representative will assume the defense or prosecution of such Third Party Claim and any litigation resulting therefrom with counsel of its choice (reasonably satisfactory to the Parent Indemnitee) and at its sole cost and expense (a "Third Party Defense"). Any Parent Indemnitee shall have the right to employ separate counsel in any such Action and to participate in the defense thereof, but the fees and expenses of such counsel shall not be at the expense of the Indemnitors unless (A) the Escrow Participants' Representative shall have failed, within the time after having been notified by the Parent Indemnitee of the existence of the Third Party Claim as provided in the first sentence of this paragraph (b), to assume the defense of such Third Party Claim, or (B) the employment of such counsel has been specifically authorized in writing by the Escrow Participants' Representative.

(c)      The Escrow Participants' Representative will not be entitled to assume the Third Party Defense if:

(i)      a Third Party Claim seeks, in addition to or in lieu of monetary damages, any injunctive or other equitable relief (except where non-monetary relief is merely incidental to a primary claim or claims for monetary damages);

(ii)      the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, allegation or investigation;

(iii)      the claim for indemnification relates to or arises in connection with any Environmental Action;

(iv)      under applicable standards of professional conduct, a conflict on any significant issue exists between the Parent Indemnitee and the Escrow Participants' Representative in respect of such Third Party Claim;

(v)      the Third Party Claim involves a material customer or supplier of the Company or any of its Subsidiaries;

(vi)      the Parent Indemnitee reasonably believes an adverse determination with respect to the Third Party Claim would be materially detrimental to or injure the Parent Indemnitee's reputation or future business prospects;

(vii)      upon petition by the Parent Indemnitee, the appropriate court rules that the Escrow Participants' Representative failed or is failing to vigorously prosecute or defend such Third Party Claim; or

(viii)   the amount of claimed Losses subject to all outstanding Notices of Claim exceeds the value of the Indemnity Escrow Fund (less the Representative Reserve Amount).

(d)      If by reason of the Third Party Claim a lien, attachment, garnishment or execution is placed upon any of the property or assets of such Parent Indemnitee, the Escrow Participants' Representative, if it desires to exercise its right to assume such Third Party Defense, must furnish a satisfactory indemnity bond to obtain the prompt release of such lien, attachment, garnishment or execution.

(e)      If the Escrow Participants' Representative assumes a Third Party Defense, it will take all steps necessary in the defense, prosecution, or settlement of such claim or litigation. The Escrow Participants' Representative will not consent to the entry of any judgment or enter into any settlement except with the written consent of the Parent Indemnitee; provided, however, the consent of the Parent Indemnitee shall not be required if all of the following conditions are met: (i) the terms of the judgment or proposed settlement include as an unconditional term thereof the giving to the Parent Indemnitee by the third party of a release of the Parent Indemnitee from all liability in respect of such Third Party Claim; (ii) there is no finding or admission of (A) any violation of Law by the Parent Indemnitee (or any Affiliate thereof), (B) any violation of the rights of any Person and (C) no effect on any other Action or claims of a similar nature that may be made against the Parent Indemnitee (or any Affiliate thereof); and (iii) the sole form of relief is monetary damages which are paid in full by the Indemnitors. The Escrow Participants' Representative shall conduct the defense of the Third Party Claim actively and diligently, and the Parent Indemnitee will provide reasonable cooperation in the defense of the Third Party Claim. Notwithstanding the foregoing, the Parent Indemnitee shall have the right to pay or settle any Third Party Claim, provided that in such event, subject to the following sentence, it shall waive any right to indemnity therefor by the Indemnitors for such claim unless the Escrow Participants' Representative shall have consented to such payment or settlement. If the Escrow Participants' Representative is not reasonably conducting the Third Party Defense in good faith, the Parent Indemnitee shall have the right to assume the Third Party Defense.

(f)      In the event that (i) a Parent Indemnitee gives Notice of Claim to the Escrow Participants' Representative and the Escrow Participants' Representative fails or elects not to assume a Third Party Defense which the Escrow Participants' Representative had the right to assume under this Section 8.4 or (ii) the Escrow Participants' Representative is not entitled to assume the Third Party Defense pursuant to this Section 8.4, the Parent Indemnitee shall have the right, with counsel of its choice, to defend, conduct and control the Third Party Defense, at the sole cost and expense of the Indemnitors. In each case, the Parent Indemnitee shall conduct the Third Party Defense actively and diligently, and the Escrow Participants' Representative will provide reasonable cooperation in the Third Party Defense and use its commercially reasonable efforts to cause the former Company Securityholders to cooperate in the Third Party Defense. The Parent Indemnitee shall have the right to consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim on such terms as it may deem appropriate; provided, however, that the amount of any settlement made or entry of any judgment consented to by the Parent Indemnitee without the consent of the Escrow Participants' Representative shall not be determinative of the validity of the claim against the Indemnity Escrow Fund or the

amount thereof, except with the consent of the Escrow Participants' Representative. Notwithstanding Section 9.8 hereof, in connection with any Third Party Claim, the Shareholder Representative hereby consents to the nonexclusive jurisdiction of any court in which an Action in respect of a Third Party Claim is brought against any Parent Indemnitee for purposes of any claim that a Parent Indemnitee may have under this Article VIII with respect to such Action or the matters alleged therein and agrees that process may be served on the Escrow Participants' Representative with respect to such a claim anywhere in the world. If the Escrow Participants' Representative does not elect to assume a Third Party Defense which it has the right to assume hereunder, the Parent Indemnitee shall have no obligation to do so.

8.5     Non-Third Party Claims. Parent will send a Notice of Claim to the Escrow Participants' Representative promptly following discovery by any Parent Indemnitee of any matter that gives rise to a claim of indemnity pursuant hereto and that does not involve a Third Party Claim being asserted against it. Concurrently therewith Parent shall send a duplicate copy of such Notice of Claim to the Escrow Agent. Failure or delay in notifying the Escrow Participants' Representative will not relieve the Indemnitors of any liability they may have to the Parent Indemnitee, except and only to the extent that such failure or delay causes actual harm to the Indemnitors with respect to such claim. The Escrow Participants' Representative will reasonably cooperate and assist the Parent Indemnitee in determining the validity of the claim for indemnity.

8.6     Claims Upon Indemnity Escrow Fund. Notwithstanding any other provision of this Article VIII, if the Escrow Participants' Representative does not timely give notice to Parent and the Escrow Agent in accordance with the terms of the Escrow Agreement that it disputes the claim for indemnity that is subject to the Notice of Claim, the Losses specified in such Notice of Claim will be conclusively deemed Losses subject to indemnification hereunder and the Escrow Agreement. In the event that the Escrow Participants' Representative timely gives notice to Parent and the Escrow Agent pursuant to the Escrow Agreement that he disputes such claim, the dispute shall be resolved in accordance with the terms of the Escrow Agreement.

8.7     Representative Reserve Amount; Indemnification of the Escrow Participants' Representative.

(a)     $500,000 of the Indemnity Escrow Fund (the "Representative Reserve Amount") shall not be payable to Parent Indemnitees and rather shall be reserved to reimburse the Escrow Participants' Representative for all reasonable, documented out-of-pocket expenses and the reasonable fees and disbursements of counsel (including expenses to be paid pursuant to the Escrow Agreement) incurred by the Escrow Participants' Representative as a result of acting as the Escrow Participants' Representative hereunder and losses, liabilities, and expenses that are incurred by the Escrow Participants' Representative as a result of acting as the Escrow Participants' Representative in respect of any claims made against the Indemnity Escrow Fund or the Working Capital Escrow Fund. The Representative Reserve Amount shall be used to reimburse the Escrow Participants' Representative pursuant to the terms of the Escrow Agreement and, pending and subject to payments made to cover any such reimbursements pursuant to the terms of the Escrow Agreement, the Representative Reserve Amount shall be held until the termination of the Escrow Agreement and the escrow created thereby, at which time the remaining Representative Reserve Amount shall be paid first to the Escrow Participants'

Representative to the extent of its outstanding claims for reimbursement, with any excess funds available for distribution being released to the Paying Representative for further distribution to the Escrow Participants pursuant to Section 2.4(b).

(b)    The Escrow Participants' Representative shall not be liable to Parent, the Company or any Escrow Participant for any act done or omitted hereunder in its capacity as the "Escrow Participants' Representative" while acting in good faith (and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith) and without gross negligence or willful misconduct. The Escrow Participants shall severally indemnify the Escrow Participants' Representative and hold it harmless against any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on the part of the Escrow Participants' Representative and arising out of or in connection with the acceptance or administration of his duties hereunder, including any out-of-pocket costs and expenses and legal fees and other legal costs reasonably incurred by the Escrow Participants' Representative. If such expenses, fees and costs are not paid directly to the Escrow Participants' Representative by the Escrow Participants or covered by payments from the Representative Reserve Amount, such expenses, fees and costs may be withheld from any distribution made to the Escrow Agent for further distribution to the Escrow Participants pursuant to Section 2.4(b).

8.8    Effect of Investigation; Waiver.

(a)    A Parent Indemnitee's right to indemnification or other remedies based upon the representations and warranties and covenants and agreements of the Company will not be affected by any investigation, knowledge or waiver of any condition by the Parent Indemnitee. Such representations and warranties and covenants and agreements shall not be affected or deemed waived by reason of the fact that the Parent Indemnitee knew or should have known that any representation or warranty might be inaccurate or that the Company failed to comply with any agreement or covenant. Any investigation by such party shall be for its own protection only and shall not affect or impair any right or remedy hereunder.

(b)    The waiver by any Parent Indemnitee of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or agreement, will not affect any right to indemnification or other remedy based on such representations and warranties and covenants and agreements unless otherwise expressly agreed in writing by the Parent Indemnitee.

ARTICLE IX

GENERAL PROVISIONS

9.1    Notices. All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be deemed given if delivered personally, by facsimile (which is confirmed) or sent by overnight courier (providing proof of delivery) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

(a)    if to Parent or Merger Sub, to:

Autonomy Corporation plc
Cambridge Business Park
Cowley Rd
Cambridge, CB4 0WS
United Kingdom
Facsimile: +44 (0) 1223 448041
Attention: Chief Executive Officer

with a copy (which shall not constitute notice) to:

Morgan, Lewis & Bockius LLP
One Market Street, Spear Tower
San Francisco, California 94105
Facsimile: (415) 442-1001
Attention: William A. Myers, Esq.

(b)     if to the Company, to:

Zantaz, Inc.
5758 West Las Positas Blvd
Pleasanton, California 94588
Facsimile: (925) 598-3144
Attention: Chief Executive Officer

with a copy (which shall not constitute notice) to:

Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
Attention: David J. Segre, Esq.
Facsimile No.: (650) 493-6811

and:

Wilson, Sonsini, Goodrich & Rosati
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Attention: Michael Ringler, Esq.
Facsimile No.: (415) 947-2099

(c)     If to the Escrow Participants' Representative:

c/o General Atlantic Service Company, LLC
3 Pickwick Plaza
Greenwich, CT 06830
Attention: Christopher G. Lanning
Facsimile No.: (203) 302-3044

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Matthew W. Abbott
　　　　　　 Douglas A. Cifu
Facsimile No.: (212) 757-3990

9.2　　Certain Definitions.

(a)　　For purposes of this Agreement the following definitions shall apply:

(i)　　An "Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

(ii)　　"Business Day" means any day other than Saturday, Sunday or any other day on which banks are legally permitted to be closed in San Francisco, United States or London, United Kingdom.

(iii)　　"Common Exchangeable Stock" means the Common Exchangeable Shares of 2040253 Ontario Inc., an Ontario corporation that is an indirect wholly owned Subsidiary of the Company.

(iv)　　"Company Capital Stock" means the Company Common Stock and the Company Preferred Stock and any other shares of capital stock, if any, of the Company, taken together.

(v)　　"Company Common Stock" means the Company's common stock, no par value.

(vi)　　"Company Other Representations" means the representations and warranties of the Company other than the Company Specified Representations.

(vii)　　"Company Preferred Stock" means all or any of the Company's Series A Preferred Stock ("Series A Preferred"), the Company's Series B-1 Preferred Stock ("Series B-1 Preferred"), the Company's Series C-1 Preferred Stock ("Series C-1 Preferred"), the Company's Series D-1 Preferred Stock ("Series D-1 Preferred"), the Company's Series E Preferred Stock ("Series E Preferred"), the Company's Series F Preferred Stock ("Series F Preferred"), and the Company's Series G Preferred Stock ("Series G Preferred").

(viii)　　"Company Shareholders" means the holders of outstanding shares of Company Capital Stock.

(ix)　　"Company Specified Representations" means the representations and warranties contained in the first sentence of Section 3.1(a)(i) (as such sentence relates to the

Company), Sections 3.1(b), 3.1(c), 3.1(d)(i), 3.1(d)(ii), 3.1(d)(iv)(A), 3.1(d)(iv)(C) and the first sentence of Section 3.1(y)(i).

(x)    "Company Stock Options" means options to purchase shares of Company Common Stock issued pursuant to the Company's 1998 Stock Plan (the "Company Stock Option Plan").

(xi)    "Company Transaction Expenses" means all fees and expenses incurred by the Company or any of its Subsidiaries in connection with the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including any and all legal, accounting, financial advisory and consulting fees, broker's fees (including the Company Broker Fee) and expenses incurred in connection therewith; provided, that Company Transaction Expenses shall exclude all fees and expenses (other than the fees and expenses of attorneys and accountants) incurred by the Parties in connection with the premerger notification and report forms under the HSR Act or applicable foreign antitrust laws.

(xii)    "Contract" means any loan or credit agreement, bond, debenture, note, mortgage, indenture, license, guarantee, lease or other contract, binding commitment, agreement, instrument, obligation, binding arrangement, binding understanding, binding undertaking, in each case (A) whether oral or written, (B) that has not been terminated or which contains any continuing obligation or liability of any party thereto, and (C) including all amendments, modifications and waivers thereto.

(xiii)    "Escrow Participants" means, collectively, Company Shareholders, holders of Vested Company Options and holders of Warrants, and each individually is an "Escrow Participant."

(xiv)    "Indebtedness" means any of the following: (a) any indebtedness for borrowed money (including any prepayment penalties or premiums), (b) any obligations evidenced by bonds, debentures, notes or other similar instruments, (c) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current Liabilities arising in the Ordinary Course of Business, (d) any obligations as lessee under capitalized leases, (e) any indebtedness created or arising under any conditional sale or other title retention agreement with respect to acquired property, (f) any obligations, contingent or otherwise, under acceptance credit, letters of credit or similar facilities, and (g) any guaranty of any of the foregoing.

(xv)    "Key Employees" means the employees of the Company or any of its subsidiaries listed on Schedule 9.1(c)(a)(xv) hereto whom Parent has extended an offer of employment.

(xvi)    "King Bonus" means $3,850,000, the amount of the bonus that will become payable to Steven R. King of the Company immediately prior to the Closing pursuant to the Amended King Retention Agreement.

(xvii)    "Knowledge" of (A) the Company means the actual knowledge of the executive officers of the Company; and (B) Parent means the actual knowledge of the executive officers of Parent.

(xviii) "Law" means any statute, law (including common law), constitution, treaty, ordinance, code, order, decree, judgment, rule, regulation and any other binding requirement or determination of any Governmental Entity.

(xix) "Made Available" means that the subject documents were located in the electronic on-line data room organized by the Company in connection with the diligence investigation conducted by Parent.

(xx) "Material Adverse Effect" means, when used in connection with the Company or Parent, as the case may be, a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of such Party and its Subsidiaries, taken as a whole, or to the ability of the Party to perform its obligations under this Agreement or to consummate the Merger or the other transactions contemplated by this Agreement; provided, however, none of the following shall be deemed in and of themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) any failure by such Party to meet internal projections or forecasts; (ii) any adverse effect to the extent attributable to the announcement or pendency of the Merger (including cancellations in customer orders, reduction in sales, disruption in relationships with suppliers, distributors, partners or similar relationships or loss of employees); (iii) any adverse effect that results from changes attributable to conditions affecting the industries in which such Party participates, the United States or United Kingdom economy as a whole, or foreign economies in any locations where such Party or any of such Party's Subsidiaries has material operations or sales (to the extent that such changes in each case do not disproportionately adversely affect such Party and its Subsidiaries taken as a whole); (iv) any adverse effect that results from (A) any Party taking any action at the written request of the other Party, or (B) any Party taking any action required by this Agreement; or (v) any adverse effect that results from any act of God, any act of terrorism, war or other armed hostilities, any regional, national or international calamity or any other similar event.

(xxi) "Net Debt" means an amount equal to the Company's Indebtedness (excluding any letter of credit unless and to the extent there has been a draw on the letter of credit as a result of a breach of the obligations secured by such letter of credit prior to Closing) less the Company's cash and cash equivalents, in each case as of the Closing, provided, however, that the amount of cash shall be deemed to include $2,350,000 of the King Bonus to be paid to Steven R. King immediately prior to the Closing pursuant to the Amended King Retention Agreement.

(xxii) "Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision entered, issued or rendered by any Governmental Entity.

(xxiii) "Ordinary Course of Business" means the ordinary course of business of the Company and its Subsidiaries, consistent with their past practices, existing prior to the date of this Agreement; provided, however, that the failure of the Company or its Subsidiaries to have taken a particular action prior to the date of this Agreement shall not necessarily mean that such action, if taken during the Pre-Closing Period, is not consistent with the past practice of the Company and its Subsidiaries.

(xxiv) "<u>Parent Other Representations</u>" means the representations and warranties of Parent other than the Parent Specified Representations.

(xxv) "<u>Parent Specified Representations</u>" means the representations and warranties contained in the first sentence of Section 3.2(a), and Sections 3.2(b)(i), 3.2(b)(iii)(A), 3.2(b)(iii)(C), 3.2(d) and 3.2(e).

(xxvi) "<u>Parties</u>" means the Company, Parent, Merger Sub and the Escrow Participants' Representative, and each shall be considered a "<u>Party</u>."

(xxvii) "<u>Permitted Liens</u>" means (a) mechanics', carriers', workmen's, repairmen's or other like liens or other encumbrances arising or incurred in the Ordinary Course of Business relating to obligations that are not delinquent or that are being contested in good faith by the Company and for which the Company has established adequate reserves, (b) liens or other encumbrances for Taxes that are not due and payable, that are being contested in good faith by appropriate proceedings or that may thereafter be paid without interest or penalty, (c) Liens that, in the aggregate, do not materially impair, and would not reasonably be expected to materially impair, the value or the continued use and operation of the assets to which they relate, (d) non-exclusive licenses of Intellectual Property Rights by the Company or a Subsidiary to customers in the Ordinary Course of Business, or (e) purchase money security interests in computer equipment (and software installed thereon) that is leased or financed pursuant to loan or lease agreements in effect as of the date of this Agreement and which are listed in Section 3.1(k)(i)(O) of the Disclosure Schedule.

(xxviii) "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

(xxix) "<u>Preferred Exchangeable Stock</u>" means the Preferred Exchangeable Shares of 2040253 Ontario Inc., an Ontario corporation that is an indirect wholly-owned Subsidiary of the Company.

(xxx) "<u>Security Documentation</u>" means (a) with respect to holders of Company Shares, certificate or certificates representing Company Shares; (b) with respect to holders of Options, option documentation representing the original grant of such Options; and (c) with respect to holders of Warrants, the warrant agreement representing the original issuance of such Warrants.

(xxxi) "<u>Subsidiary</u>" of a particular Person means another Person where the first Person directly or indirectly owns, beneficially or of record, (a) an amount of voting securities or other voting interests in such other Person that is sufficient to enable such first Person to elect at least a majority of the members of such other Person's board of directors or comparable governing body, or (b) if there are no such voting interests, at least 50% of the outstanding equity interests issued by such other Person.

(xxxii) "<u>Transaction Documents</u>" means the Escrow Agreement and the Agreement of Merger.

(xxxiii) "<u>Working Capital</u>" as of any date means (i) current assets less cash

and cash equivalents minus (ii) current liabilities less Indebtedness, in each case determined in a manner consistent with the Company's application of GAAP in the preparation of the Balance Sheet except as set forth on <u>Exhibit J</u>.

(xxxiv)"<u>$</u>" means United States dollars.

9.3    <u>Interpretation</u>. When a reference is made in this Agreement to an Article or Section or the Disclosure Schedule, such reference shall be to an Article or Section of, or the Disclosure Schedule to, this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement without express reference to any particular provision of this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

9.4    <u>Counterparts</u>. This Agreement may be executed by facsimile signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

9.5    <u>Entire Agreement; No Third-Party Beneficiaries</u>. This Agreement (including the documents and instruments referred to herein) and the Confidentiality Agreement (i) constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter of this Agreement and (ii) except for the provisions of Article II, Section 5.5 and Article VIII, are not intended to confer upon any Person other than the Parties any rights or remedies. Without limiting the generality of the foregoing, (a) Parent and Merger Sub acknowledge that the Company has not made and is not making any representations or warranties whatsoever regarding the subject matter of this Agreement, express or implied, except as provided in Section 3.1, and that they are not relying and have not relied on any representations or warranties whatsoever regarding the subject matter of this Agreement, express or implied, except as provided in Section 3.1; and (b) the Company acknowledges that Parent and Merger Sub have not made and are not making any representations or warranties whatsoever regarding the subject matter of this Agreement, express or implied, except as provided in Section 3.2, and that it is not relying and has not relied on any representations or warranties whatsoever regarding the subject matter of this Agreement, express

or implied, except as provided in Section 3.2.

9.6    Governing Law. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of California, regardless of the Laws that might otherwise govern under applicable principles of conflict of laws thereof.

9.7    Assignment. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of Law or otherwise by any Party without the prior written consent of the other Parties. Any assignment in violation of the preceding sentence shall be void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and assigns.

9.8    Consent to Jurisdiction. Each of the Parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of either (a) the state courts located in San Francisco, California or (b) any Federal court of the United States of America sitting in the Northern District of California, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby (and each agrees that no such action, suit or proceeding relating to this Agreement shall be brought by it or any of its Affiliates except in such courts). Each of the Parties further agrees that, to the fullest extent permitted by applicable Law, service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action, suit or proceeding in California with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each of the Parties irrevocably and unconditionally waives (and agrees not to plead or claim) any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (a) the state courts located in San Francisco, California or (b) any Federal court of the United States of America sitting in the Northern District of California, or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.9    Enforcement. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy in any California State court located in San Francisco, California or any Federal court of the United States of America sitting in the Northern District of California to which they are entitled at law or in equity.

9.10    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

9.11    Obligations of Parent. Parent shall ensure that Merger Sub and the Surviving Corporation duly performs, satisfies and discharges on a timely basis each of the covenants,

obligations and liabilities of Merger Sub and the Surviving Corporation under this Agreement, and Parent shall be jointly and severally liable with Merger Sub and the Surviving Corporation for the performance of the covenants and obligations of Merger Sub and the Surviving Corporation under this Agreement.

*(The remainder of this page has intentionally been left blank)*

IN WITNESS WHEREOF, the parties have caused this Agreement and Plan of Merger to be signed as of the date first written above.

**AUTONOMY CORPORATION PLC**

By: _____

Its: _____

**ANTELOPE ACQUISITION CORP.**

By: _____

Its: _____

**ZANTAZ, INC.**

By: _____

Its: _____

**GA ESCROW, LLC**

By: _____

Its: _____

[Signature Page to Agreement and Plan of Merger]

IN WITNESS WHEREOF, the parties have caused this Agreement and Plan of Merger to be signed as of the date first written above.

**AUTONOMY CORPORATION PLC**

By:   _____

Its:   _____

**ANTELOPE ACQUISITION CORP.**

By:   _____

Its:   _____

**ZANTAZ, INC.**

By:   _~~Signature~~_____

Its:   _CHIEF FINANCIAL OFFICER_____

**GA ESCROW, LLC**

By:   _____

Its:   _____

[Signature Page to Agreement and Plan of Merger]

IN WITNESS WHEREOF, the parties have caused this Agreement and Plan of Merger to be signed as of the date first written above.

**AUTONOMY CORPORATION PLC**

By: _____

Its: _____

**ANTELOPE ACQUISITION CORP.**

By: _____

Its: _____

**ZANTAZ, INC.**

By: _____

Its: _____

**GA ESCROW, LLC**

By: _____
          Matthew Nimetz
          A Managing Director

Its: _____

[Signature Page to Agreement and Plan of Merger]

**Exhibit A**

**Form of Representative Agreement**

*(attached hereto)*

**Exhibit B**

**Form of Employment Addendum**

*(attached hereto)*

**Exhibit C**

**Form of Amended King Retention Agreement**

*(attached hereto)*

**Exhibit D**

**Form of Agreement of Merger**

*(attached hereto)*

**Exhibit E**

**Form of Surviving Company Articles of Incorporation**

*(attached hereto)*

**Exhibit F**

**Form of Escrow Agreement**

*(attached hereto)*

**Exhibit G**

**Form of FIRPTA Certificate**

*(attached hereto)*

**Exhibit H**

**Form of Legal Opinion**

*(attached hereto)*

**Exhibit I**

**Form of CFO Certificate**

*(attached hereto)*

**Exhibit J**

**Working Capital**

For purposes of determining Working Capital:

A.      The following items <u>shall not be</u> considered a current liability:

- any Closing Deductions to the extent they have reduced the $400,000,000 pursuant to Section 2.1(a) of the Agreement

- the $1,000,000 bonus that will become payable to Steven R. King of the Company following the Closing pursuant to the Amended King Retention Agreement

B.      The following item <u>shall be</u> considered a current liability:

- The liability payable to Fast Search & Transfer, Inc. ("<u>FAST</u>") on the Closing Date pursuant to the OEM License dated December 29, 2006 (the "<u>Fast Payable</u>")

C.      The following items <u>shall not be</u> considered a current asset:

- The prepaid royalty to Verity, Inc. on the Closing Date

- The prepaid royalty to FAST on the Closing Date

1-SF/7551827.11

**Schedule 5.5(b)**

**D&O Insurance Premiums**

$220,000

**Schedule 9.2(a)(xv)**

**Key Employees**

Roger Erickson

Steve Kennedy

Mike Sullivan